THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v EDWARD BOWEN, Appellant.

First Department, December 21, 1978

## APPEARANCES OF COUNSEL

*David G. Secular* of counsel *(Martin Erdmann* and *William E. Hellerstein,* attorneys), for appellant.

*Carol Y. Kendrick* of counsel *(Alan D. Marrus* with her on the brief; *Mario Merola, District Attorney),* for respondent.

## OPINION OF THE COURT

BIRNS, J.

The defendant was convicted by a jury of attempted rape in the first degree and sentenced to a term of 5 to 15 years. On this appeal, we are confronted by two claims of the defendant. As outlined in the dissenting opinion, they are: First, that the defendant's constitutional rights were violated when he was cross-examined concerning his failure, at the time of his arrest, to give the police the exculpatory account to which he testified at trial. Second, that the defendant's right to a fair trial was gravely impaired when he was cross-examined concerning the events underlying a previous arrest in a manner "painstakingly" calculated to persuade the jury that he was predisposed to commit the same kind of crime with which he was charged.

We disagree with the reasons expressed in the dissenting opinion which would accept these claims of the defendant, reverse the conviction herein and order a new trial. We would affirm the conviction for the reasons which follow.

On May 13, 1975, at about 6:25 A.M., Gladys Ramos left her home and walked one and one-half blocks to a garage on River Avenue where she kept her car parked. Inside the garage, she was confronted by a man pointing a gun at her. When she screamed, the man grabbed her by the neck and started choking her, during which period she kept screaming. Ultimately, she felt a blow to the side of her head and became unconscious. When she regained consciousness, police officers were standing over her and she was lying in the back of the garage with her dress and slip pushed up to her chest and her pantyhose and panties down to her knees exposing her lower torso. Ms. Ramos' identification of the defendant at trial was at first somewhat uncertain, but she then stated, "The gentleman that's sitting there is the face that I still keep seeing. I cannot forget that face."

Victor Rodriguez resided in a fourth floor apartment with windows facing Ms. Ramos' garage. At the time and date with

which we are concerned, Mr. Rodriguez heard a woman's screams, looked out the window to see what was happening, saw that the garage door was open, and realized the screams were coming from the garage. He left his window for 30 seconds to tell his brother-in-law, who lived down the hall, to call the police. Returning to his window, Mr. Rodriguez saw, "a man's hand, a black hand" closing the garage door from the inside. He remained at the window and watched the closed garage door until the police arrived minutes later. When the police opened the door, the defendant emerged and was taken into custody.

Since there was no other exit from the garage, it follows that whoever was found in the garage when the police came is the same person who closed the door from the inside. Moreover, the circumstances of this case lead to no other conclusion but that whoever closed the door from the inside is the one who attacked Ms. Ramos. When the police arrived and opened the garage door, the defendant was seen standing with gun drawn, a short distance from Ms. Ramos. The defendant at that time identified himself as a police officer. He was arrested, transported in a police car to a police precinct and two hours later, after being given the *Miranda* warnings, was questioned by his supervisor, Captain Lucas, a friend for 36 years, to whom he made a brief inculpatory statement.

Defendant Bowen, who was indeed a Housing Authority Patrolman for over eight years, testified he called his supervising officer prior to six o'clock that morning and asked for time off to straighten out a few problems. He armed himself with a gun, extra ammunition, a blackjack and bayonet, and wandered, without any particular destination, across the 155th Street Bridge into The Bronx. He testified that he heard Ms. Ramos' screams and ran a distance of one and one-half blocks toward the screams. This took somewhat less than 30 seconds. The defendant testified he found Ms. Ramos' garage door open about four feet and ducked inside without drawing any of the many weapons he carried. He conceded this was not good police procedure. Upon entering the garage, the defendant claimed he was immediately struck in the face and neck, and stunned, by an unknown assailant. The defendant then heard the garage door closing. Several minutes later, the police arrived and told him to throw out his gun.

■ Viewing the evidence up to this point, it is notable that defendant's story contradicts both the testimony of Ms. Ramos

who positively identified him as her attacker, and also that of Mr. Rodriguez who told of his observations. Thus, in order for defendant's testimony to be true, Ms. Ramos would have to be mistaken or lying about her identification of the defendant as the man who attacked her at close range. Mr. Rodriguez would have to be not only mistaken about having been away from his window a brief 30 seconds, but he would have had to be lying about "a man's hand, a black hand" closing the door from the inside and about not thereafter leaving the window until the police came. We find nothing in the record to support such a possibility. Issues of credibility are primarily for the jury, and here, not surprisingly, the jury accepted the testimony of Ms. Ramos and Mr. Rodriguez. There is no basis to speculate here, as does our dissenting colleague, whether the jury accepted as "letter perfect" the testimony of Mr. Rodriguez, as a background for our consideration whether there was constitutional error warranting reversal, and this is certainly not a case where the verdict is against the weight of the evidence (cf. *People v Yanik,* 63 AD2d 574).

Defendant's testimony was that he was a Housing Police Officer who came to Ms. Ramos' rescue and was then himself the victim of an assault by a phantom assailant. When the police arrived, beyond identifying himself as a police officer, the defendant did not report that his actions were in the line of duty *(Matter of Washington v New York City Housing Auth.,* 31 AD2d 700, affd 24 NY2d 912; *Burns v City of New York,* 6 AD2d 30, 33-34; Public Housing Law, § 402, subd 5; CPL 1.20, subd 34, par [e]), in attempting to aid the victim of a possible crime, as he testified on the witness stand, or the fact that he, a police officer, had been assaulted. Hence, his silence where there was a duty to speak invited cross-examination. The District Attorney thus attempted to impeach defendant's testimony which was apparently tailored after the fact to explain how he, the defendant, was caught standing *flagrante delicto* near Ms. Ramos' half-naked body.

Questions directed to these areas were asked by the District Attorney without objection by defense counsel. Nevertheless, the defendant claims that his right to a fair trial was violated when the court permitted the District Attorney to question him about the exercise of his constitutional right to remain silent after his arrest. In view of this claim, we shall explore the propriety of this aspect of the cross-examination *(People v McLucas,* 15 NY2d 167, 172; *People v Kelly,* 12 NY2d 248,

250; *People v Jones,* 32 AD2d 1069, 1070, affd 27 NY2d 501; CPL 470.15, subd 6, par [a]).[1]

In 1974, our Court of Appeals decided *People v Rothschild* (35 NY2d 355). In that case, the defendant, a police officer, was convicted of grand larceny and attempted grand larceny, both by extortion. The defendant in that case contended that the complaining witness was attempting to bribe him, and that he, the defendant, had agreed to accept money from the complaining witness in order to later arrest him for bribery. The prosecutor in that case impeached the defendant by asking whether he had told his superior officers or anyone after his arrest, that he was attempting to get the complaining witness on a charge of bribery. An objection to the inquiry was overruled, and the Court of Appeals held this was proper.

While recognizing the general rule that the silence of a defendant, after arrest, cannot be used against him on the prosecution's direct case *(People v Rothschild, supra,* p 359), the court held that defendant's silence could be used for purpose of cross-examination "when such silence is patently inconsistent with the defense asserted, and there is a patent obligation to speak" *(supra,* p 360). The linchpin of this decision was defendant's status as a police officer.

"The natural consequences of his status as a law enforcement officer would require him to promptly report any bribe or attempted bribe to his superiors, and certainly protest and reveal such an alleged scheme after his arrest to them, and to his fellow officers as well." *(Rothschild, supra,* pp 360-361.)

In 1976 the United States Supreme Court decided *Doyle v Ohio* (426 US 610). In that case, the defendant, who was not a police officer, had remained silent after *Miranda* warnings, gave an exculpatory story at trial, and then was cross-examined about his silence. The court held that while it is true that *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings *(supra,* p 618). The court went on to hold that the use for impeachment purposes of a defendant's silence, at the time of his arrest and after receiving *Miranda* warnings, violated the due process clause of the

---

1. We deem it immaterial that *Miranda* warnings had not been given to the defendant prior to the silence (i.e., failure to give his exculpatory story) used to impeach him at trial. We thus treat this case as if the defendant had been given his *Miranda* warnings at the time of his arrest, when he was entitled to have received those warnings.

Fourteenth Amendment *(supra, p 619)*. However, the Supreme Court recognized that the State may wish to claim that the use, in the circumstances of that case, might have been harmless error, and therefore remanded the case to the State court for further proceedings.

We are not convinced, as is our dissenting brother, that *Doyle v Ohio* (426 US 610, *supra)* overruled our Court of Appeals' decision in *People v Rothschild* (35 NY2d 355, *supra)*. Until the Court of Appeals holds that *Rothschild* is no longer the law in this State, or the Supreme Court makes a similar ruling in a case involving a police officer (or another type of public officer who is under a duty to speak), we are bound by the ruling in *Rothschild.* We therefore hold that the prosecution's use of defendant's silence immediately after his arrest was properly admitted to impeach defendant's exculpatory story. Perhaps equally important, we hold on the facts in the particular circumstances of this case, that even if it was constitutional error to admit defendant's postarrest silence to impeach him, there was no reasonable possibility that the error might have contributed to defendant's conviction and thus such error, if any occurred, was harmless beyond a reasonable doubt (see *Doyle v Ohio,* 426 US 610, 619-620, *supra; Chapman v California,* 386 US 18; *People v Almestica,* 42 NY2d 222, 226; *People v Crimmins,* 36 NY2d 230, 237).

We note in passing, the defendant did make a statement in the nature of a confession. Captain Lucas, defendant's supervising officer in the House Authority Police Department, and defendant's friend for some 36 years, came to the 44th Precinct to talk to the defendant two hours after *Miranda* warnings had been given by the police. Captain Lucas asked the defendant, "What happened Eddie?", and the defendant responded, "She said something to me and I said something to her, and I guess I lost my temper." This statement, although suppressed by the court at a pretrial hearing as made in violation of defendant's *Miranda* rights,[2] nevertheless, was admissible to impeach defendant's story at trial concerning the circumstances under which he said he was in the garage. As the United States Supreme Court stated in *Harris v New York* (401 US 222, 226): "The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior incon-

---

2. Defendant had declined to make a statement to the police after receiving the *Miranda* warnings.

sistent utterances." (See, also, *People v McGrath,* 46 NY2d 12).

■ The dissenting opinion concludes that defendant's right to a fair trial was "further impaired" when he was cross-examined with regard to the facts underlying a prior arrest. We concede the marked similarity between the facts in the instant case and the Assistant District Attorney's questions about a prior altercation with one Glenda Ollie, also known as Darlene, on September 18, 1973, and we agree that it was improper for the District Attorney to interject, as he did at one point, a question which tended to emphasize a similarity between the questioned assault on Glenda Ollie and the attack on Gladys Ramos. This case may approach the outer limits of discretionary admissibility of prior immoral acts bearing on a defendant's credibility *(People v Duffy,* 36 NY2d 258, 262-263, cert den 423 US 861). Nevertheless, the questions did not constitute reversible error since defendant categorically denied the attack on Glenda Ollie. The District Attorney did not unduly dwell on these questions *(People v Sorge,* 301 NY 198) and never suggested, during his summation, that because defendant had committed a similar crime in 1973, he had committed the present crime (cf. *People v Walker,* 59 AD2d 666). We find the defendant was not denied a fair trial.

Accordingly, the judgment of the Supreme Court, Bronx County (QUINN, J.), rendered December 2, 1975, convicting defendant after a jury trial of attempted rape in the first degree and sentencing him to a term of 5 to 15 years, should be affirmed.

FEIN, J. (concurring). I concur in the result reached by the majority upon constraint of *People v Rothschild* (35 NY2d 355). However, I am in agreement with the dissent that the prosecutor's cross-examination of defendant concerning a prior criminal act, similar to that charged here, exceeded the bounds of proper cross-examination under *People v Sandoval* (34 NY2d 371). The nature of the interrogation evinced an intention by the prosecution to establish a predisposition by defendant to commit the precise crime here involved. This was plainly improper. *(People v Zackowitz,* 254 NY 192, 197.) Nevertheless, in view of the clear proof of guilt, I find the error not to be so prejudicial as to require reversal and remand for a new trial *(People v Crimmins,* 36 NY2d 230).

SANDLER, J. (dissenting). The defendant's conviction for

attempted rape in the first degree should be reversed and a new trial directed for two compelling reasons.

First, the defendant's constitutional rights were violated when he was cross-examined concerning his failure to give to the police and others at the time of his arrest the exculpatory account to which he testified at trial. Second, the defendant's right to a fair trial was gravely impaired when he was cross-examined concerning the events underlying a previous arrest in a manner painstakingly calculated to persuade the jury that he was predisposed to commit precisely the kind of crime with which he was charged.

Gladys Ramos, a registered nurse, testified that at about 6:25 A.M. on May 13, 1975, she entered a garage where her car was parked preparatory to driving to work. She observed a man in the garage pointing a gun at her. She screamed and the man grabbed her. Mrs. Ramos continued to scream and struggle. The man said "Shut up" and at one point said "Shut up or I'll kill you." She then felt a blow to the side of her head and lost consciousness.

When Mrs. Ramos regained consciousness, police officers were standing over her and she was lying on the floor of the garage with her dress and slip pushed up to her chest and her pantyhose and panties down to her knees. The police covered her with a blanket and took her to a hospital.

She identified the defendant as her assailant although with some degree of uncertainty, first stating that the defendant was similar to the man she saw and then, more strongly, that his was "the face I still keep seeing."

Victor Rodriguez lived in an apartment with windows facing the garage. Shortly before 6:30 A.M. he heard a scream, ran out of his apartment to his brother-in-law's apartment down the hall, told him to call the police, and then returned to his apartment to watch the garage. He estimated the elapsed time as 30 seconds. He then saw a black man's hand closing the garage door from the inside and continued to watch the closed door until the police arrived some two or three minutes later. The door he watched was the only entrance into the garage.

Two police officers testified that they responded at about 6:35 A.M. to a radio run, and were directed to the garage, where one of them opened the door. That officer saw the defendant holding a gun and both jumped back, the door closing by itself.

One officer yelled "Throw out the gun." The door was opened further and the defendant was observed standing there. He was ordered to lie on the floor and handcuffed. Defendant was armed with a blackjack, bayonet and additional rounds of ammunition.

Mrs. Ramos was lying in the back of the garage. Her dress and slip were pushed up to her chest and her panties and pantyhose were down to her knees. There was a bruise on her cheek, scratches on her throat, and her eyes were discolored from ruptured blood vessels. She then sat up and was attended by other police officers who covered her with a blanket and took her to a hospital.

The defendant, a Housing Authority policeman for some nine years, testified that he had called his supervisor before 6 o'clock in the morning and asked for some time off to straighten out some personal problems. He armed himself because of the dangerous character of the neighborhood in which he lived. The defendant walked apparently without any particular destination towards the area in which these events occurred.

Defendant said that he heard screams, ducked into the garage door to see what was going on, and was struck under the left eye and in the neck. Stunned by the assault and semiconscious, he dimly heard the garage door closing. After a few minutes he struggled to his feet and took out his gun. The garage door started to open and he observed police officers. At their demand he threw out the gun, was *forced* to the ground, and told to remain quiet. He identified himself to them as a police officer.

Indisputably the evidence presented by the District Attorney was persuasive and the defendant's own explanation far from convincing. Nonetheless, the conviction was by no means inevitable if the case had been appropriately tried. The strength of the District Attorney's case depended in substantial part on the testimony of Mr. Rodriguez which was fundamentally inconsistent with the defendant's own account.

While the sincerity of this witness is beyond question, it is by no means clear that a jury must necessarily have accepted as letter perfect his memory of the exciting, fast-moving events that occurred following the screams. If, for example, a juror doubted his memory as to when he first looked out the window, or his estimate of the time that elapsed between the screams and his first observation, or his recollection that he

looked at the garage door continuously from his first observation until the arrival of the police, his testimony could have been reasonably evaluated as much less damaging than it appeared to be.

It is in this factual setting that we must consider the prosecutor's cross-examination of the defendant concerning his failure to tell the police when arrested that which he testified to as a witness.

At the time the case was tried, the controlling authority was *People v Rothschild* (35 NY2d 355). In *Rothschild,* a police officer charged with accepting a bribe testified that he accepted the money in question pursuant to a plan to arrest for bribery the person giving him the money.

He admitted on cross-examination that he had not informed a superior officer of the alleged bribe offer prior to his acceptance of the money. He also admitted, in answer to a question to which an objection was overruled, that he had not told any superior officer or anyone after his arrest that he was attempting to make a bribery arrest.

The Court of Appeals held that the objection to this question, apparently the only question put on the subject, was properly overruled. The opinion described the issue presented as a novel one. It was noted in a footnote that other jurisdictions had arrived at varied results on that very question.

Relying in part on what was perceived as an analogy to the ruling by the Supreme Court in *Harris v New York* (401 US 222) the court concluded *(People v Rothschild,* 35 NY2d 355, 360-361, *supra):*

"Here we are presented only with the question of whether nonutterances, or silence, may be used against the defendant on cross-examination, when such silence is patently inconsistent with the defense asserted, and there is a patent obligation to speak. * * *

"We conclude that in the posture of this case the defendant's silence may be the proper subject of cross-examination * * * The natural consequences of his status as a law enforcement officer would require him to promptly report any bribe or attempted bribe to his superiors, and certainly protest and reveal such an alleged scheme after his arrest to them, and to his fellow officers as well."

After *Rothschild* was decided, the basic issue was addressed for the first time by the United States Supreme Court in

*United States v Hale* (422 US 171). The conviction was reversed in an opinion that reserved for a later date the due process question.

The court held *(supra,* p 173): "We find that the probative value of respondent's pretrial silence in this case was outweighed by the prejudicial impact of admitting it into evidence."

The following comment is pertinent *(supra,* p 177): "At the time of arrest and during custodial interrogation, innocent and guilty alike—perhaps particularly the innocent—may find the situation so intimidating that they may choose to stand mute."

In *Doyle v Ohio* (426 US 610) the constitutional issue implicit in this kind of cross-examination was squarely faced and decided. After referring to the *Miranda* warnings, the Supreme Court went on to say *(supra,* pp 617-618): "Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested * * * In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial."

The court then concluded *(supra,* p 619): "We hold that the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment".

I see no support whatever in the *Doyle* decision for an interpretation that the holding in *Rothschild* (35 NY2d 355, *supra)* remains viable for the special facts there presented. The Supreme Court said (426 US 610, 617, *supra)* that "every post-arrest silence is insolubly ambiguous." It did not say that only some were, or that only those that did not involve a police officer were. We surely may not assume that the word "every" was selected casually, or by some mischance, or without full awareness of the problem presented in *Rothschild* which had been decided prior to the decision of the Supreme Court in *Doyle* and was surely known to that court. Indeed, it could be persuasively argued that the *Doyle* analysis applies with even greater force to a police officer arrested under incriminating circumstances. Such an arrestee might reasonably be thought to be even more conscious than the average

person of the wisdom of consulting a lawyer before saying anything and of the likelihood that whatever he said would be futile at best and might prove damaging.

Even if I am in error with regard to this, and *Rothschild* (35 NY2d 355, *supra)* remains viable law, it would surely be a dubious enterprise at this point to extend *Rothschild* to the situation of an off-duty housing patrolman who said that he responded (as a civilian might have) to a woman's screams.

Accordingly, what occurred here was a constitutional error as to which it cannot be seriously urged that the error was harmless beyond a reasonable doubt. *(People v Crimmins,* 36 NY2d 230, 237.)

What the record discloses was not simply one or two questions not followed up by the District Attorney, and of no likely consequence. The defendant's interrogation as to his silence at the time of arrest was a substantial and effective part of the cross-examination. His answers to questions that should not have been put were astutely exploited to damage his credibility in a case in which the defendant's credibility was critical.

Thus, following up on the defendant's claim that he had quickly indentified himself as a police officer, the District Attorney asked if he told the arresting officers the story he told on the witness stand. The defendant responded that he had no opportunity to do so since he had been forced to lie on the ground and told to be quiet.

When then asked if he had an opportunity to talk to the police officers in the patrol car on the way to the precinct, the defendant was forced to acknowledge that he had not spoken to them although there was an opportunity to do so. The effectiveness of this can hardly be doubted. And the very same theme was renewed later in the cross-examination, with comparable results, with regard to defendant's omission to tell the arresting officers that he had been struck by the alleged unknown assailant and suffered injuries.

The defendant's right to a fair trial was further impaired by the character of his cross-examination with regard to the facts underlying a prior arrest. The District Attorney made an unmistakable effort to persuade the jury that the defendant was predisposed to commit precisely the kind of crime charged. His questions were meticulously designed to inform the jury that the defendant had been previously accused by another woman of criminal behavior that was in all material respects identical to that for which he was on trial.

During this cross-examination the defendant acknowledged that at about 4:30 A.M. on September 18, 1973, he had an altercation with a certain woman.

The record discloses the following questions and answers:

"Q On that day. Did you take out your gun and threaten to kill this girl on that date?

"A No sir.

"Q. Was this a girl friend of yours?

"A Yes sir, it was.

"Q Didn't you place a gun to her head, on that date?

"A No sir, I didn't.

"Q Did you knock her to the ground on that date?

"A No sir, I didn't.

"Q Did you tell her not to scream anymore or you'd blow her head off?

"A No sir, I didn't.

"Q On that date?

"A No sir.

"Q On that day, on May 13th, 1975—1975, didn't you put the gun to the head of Gladys Ramos and tell her to shut up or you'd blow her head off?

"A No sir, I didn't.

\* \* \*

"Q Did you have an altercation with Glenda Ollie on September 18, 1973?

"A As I said before—

"Q Did you have an altercation with her on that date? Yes or no?

"A I had an altercation with a Darlene that I knew Glenda Ollie as being.

"Q Is it a fact that on that same date, at about 4:30 in the morning, she said she had never seen you before?

"A That is correct.

"Q And that you had come up to her and put a gun to her head and told her you'd blow her head off?

"A She said that?

"Q Did she say that?

"A Did she say that to me? She didn't say that to me.

"Q Did she say that?

"A I have no idea. She might have advised the police of that.

"MR. BROUGHTON: Objection.

"THE COURT: No. Overruled."

The adroit insertion into the middle of this examination concerning the prior incident of a question directed to the charge on trial, patently designed to dramatize the similarity of the two events, makes the District Attorney's improper purpose transparently clear, if indeed there were otherwise any basis for doubt.

What occurred was grossly unfair, in blatant violation of a long-established fundamental principle, and whether considered by itself or in conjunction with that described earlier, deprived the defendant of a fair trial. (*People v Mayrant*, 43 NY2d 236, 239; *People v Zackowitz*, 254 NY 192, 197; *People v Santiago*, 47 AD2d 476, 479.)

Chief Judge CARDOZO long ago expressed the controlling principle in *People v Zackowitz* (254 NY 192, 197, *supra*): "Inflexibly the law has set its face against the endeavor to fasten guilt * * * by proof of character or experience predisposing to an act of crime * * * The endeavor has been often made, but always it has failed."

KUPFERMAN, J. P., and LANE, J., concur with BIRNS, J.; FEIN, J., concurs in an opinion; SANDLER, J., dissents in an opinion.

Judgment, Supreme Court, Bronx County, rendered on December 2, 1975, affirmed.