Joseph HAWKINS, a/k/a Joseph Davis,
Petitioner-Appellant,

v.

Eugene LeFEVRE, Superintendent,
Clinton Correctional Facility,
Respondent-Appellee.

No. 774, Docket 84–2372.

United States Court of Appeals,
Second Circuit.

Argued Feb. 28, 1985.

Decided April 1, 1985.

Frederick S. Cohen, Asst. Atty. Gen., New York City (Robert Abrams, Atty. Gen., State of N.Y., Gerald J. Ryan, Joyce M. Andren, New York City, of counsel), for respondent-appellee.

Lynn W.L. Fahey, The Legal Aid Society, New York City, William E. Hellerstein, The Legal Aid Society, New York City, for petitioner-appellant.

Before KAUFMAN, OAKES and MESKILL, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge.

To some, silence is golden; to others, it is "insolubly ambiguous." *Doyle v. Ohio*, 426 U.S. 610, 617, 96 S.Ct. 2240, 2244, 49 L.Ed.2d 91 (1976). Today, we are called upon to examine the concept of silence in its manifold legal permutations. We shall attempt to glean meaning from a state court's silent affirmance of a criminal conviction, evaluate the effect of an express assurance to the accused that he has a right to remain silent, and decipher what message—if any—is conveyed when a criminal defendant chooses to exercise his right of silence.

This appeal arises from Judge Wexler's denial of Joseph Hawkins's petition for a writ of habeas corpus, stemming from his 1975 conviction by the New York State Supreme Court (Harold Hyman, *Justice*) on charges of first degree robbery.

■ In deciding this appeal, we are mindful that Congress has expressly authorized the litigation of constitutional claims and defenses in a federal district court after a state has vindicated its interests through trial of the substantive criminal offense in the state courts. *See* 28 U.S.C. § 2254 (1982). By affording criminal defendants post-trial access to the federal courts, Congress has reinforced the notion that the federal judiciary is vested with the primary responsibility for preserving federal rights and privileges.

Against these powerful concerns must be balanced a state's interest in ensuring allegiance to its procedural requirements. A willingness by federal courts to permit review of state convictions where a criminal defendant failed to comply with a state's procedures would detract from the perception of a state criminal trial as a decisive event. Federal courts must steadfastly refrain from slighting the state forum, denying state judges a meaningful role in matters of constitutional adjudication, or underestimating the importance of finality in criminal trials.

Situated at the fulcrum of these conceptual bases militating both for and against

the availability of federal habeas corpus is the doctrine of procedural waiver. Broadly speaking, this doctrine may best be understood as an attempt by the federal judiciary to strike a balance between the constitutional rights of a criminal defendant and a state's interest in the integrity of its judicial procedural regime.

Because the factual setting of this case bears so prominently on our ultimate determination, we shall proceed carefully to set forth the relevant facts.

## I.

The origins of this action may be traced to the evening of February 24, 1975. At approximately 8:00 p.m., Olga and Farkas Citron were robbed at knife-point by two assailants, as they attempted to enter their apartment in Queens. More significant than the grisly particulars of the crime was the fact that neither Olga nor Farkas Citron [1] was able to identify Hawkins as one of the perpetrators, although the robbery lasted between two and three minutes and the Citrons enjoyed a clear view of the robbers in an illuminated hallway. At trial, Mr. Citron testified that though it was "possible," he was not "sure" Hawkins was one of the robbers. Mrs. Citron evinced more certainty, testifying that "I'm quite sure that he was not one [of the robbers]." Indeed, the shorter assailant (allegedly Hawkins) was described by Mr. and Mrs. Citron as a "very young man, about twenty [years old], between five feet one inch and five feet five inches tall, with no facial scars." In sharp contrast to this verbal portrait, Hawkins was thirty-eight years old, five feet seven inches tall, with a six-inch scar across his forehead, as well as a smaller scar on his cheek.

The only inculpatory testimony presented at Hawkins' trial—held before a judge sitting without a jury—was that offered by Steven Jones, a security guard for Smart Security. Jones testified that on the evening of the crime, while stationed in the center of the apartment complex that housed the Citrons, he was approached by a young boy who apprised him that a robbery was in progress. Jones alleged that he rushed to the Citron's building and, standing approximately 25 feet from its entrance, witnessed the robbery take place. After three or four minutes, the robbers fled into the darkness. Notwithstanding Jones's pursuit, the two assailants disappeared among the maze of apartment buildings.[2] Jones alleged, however, that prior to their escape, he managed to catch a glimpse of the shorter robber's face, as it was illuminated by a street lamp. Jones testified that he recognized this man as someone with whom he had spoken briefly one month earlier. Eleven days after the robbery, Jones again saw the man he identified as the short assailant and summoned a police officer, who placed Hawkins under arrest.[3]

Because the testimony offered by Jones provided the sole link between Hawkins and the crime, the defense counsel devoted considerable effort to puncturing holes in Jones's story. As the trial unfurled, the contradictions, inconsistencies and impossibilities inherent in Jones's testimony mounted. First, the crime testified to by Jones bore little resemblance to that witnessed firsthand by the Citrons. The dissimilarities were striking not only in terms of the particulars surrounding the crime, but also relating to the precise location of the robbery and the weapons used in the course of the crime.

More importantly, the documentary evidence assembled and explained by John Stratford, a Legal Aid Society investigator,

---

**1.** In presenting its case, the prosecution called four witnesses: Olga and Farkas Citron; Bruce Carroll, the police officer who arrested Hawkins; and Steven Jones, the security officer who identified Hawkins as one of the robbers.

**2.** In the security report prepared following the robbery of the Citrons, Jones did not mention

that he witnessed the crime or that he chased the perpetrators.

**3.** Officer Carroll testified that none of the property stolen from the Citrons was recovered from Hawkins at the time of his arrest.

demonstrated that Jones could not possibly have observed the robbery from where he claimed he stood. Indeed, the crime would have been within Jones's optical range only if his vision were capable of penetrating a set of solid double doors, turning left, ascending a staircase, and again turning left. When confronted with this physical impossibility, Jones at first equivocated and, ultimately, changed much of his story.

Hawkins, in his own behalf, testified that he worked as a carpenter at a nearby housing development. After work on the day of the robbery, Hawkins claimed to have had a few drinks with the head carpenter, and then visited the home of a friend, Robin Bates. At approximately 8:30 p.m., Hawkins left Bates's apartment to "go out and pick up some food." On the way back, Hawkins alleges he saw two men he knew from the neighborhood (Edward St. John and Fred Brown) running from the general direction of the Citrons' building. As they approached, the shorter man cautioned Hawkins, "You better get away. We just robbed somebody." At that point, with security officer Jones in hot pursuit, Hawkins fled and returned to Bates's apartment. Although Hawkins's alibi was largely corroborated by the testimony presented at trial by Robin Bates, certain inconsistencies between the two versions did emerge.[4]

At the close of the evidence, but before the defense had been afforded the opportunity to sum up, the state trial judge hastened to pronounce Hawkins guilty. Upon being apprised of his error, the judge apologized for "jumping the gun" and invited defense counsel to sum up. The court repeatedly interrupted defense counsel's summation (relevant portions of which are reprinted in the margin)[5] to voice concern

---

4. A possible explanation for these temporal discrepancies may be offered by the fact that Hawkins testified he was not wearing a watch, and could therefore only estimate the time.

5. Relevant portions of the colloquy between defense counsel and the court read as follows:

THE COURT: Can you explain something to me?

MR. C. LEVINE: I will try my best to do so.

THE COURT: He knew who this light-colored fellow was.

At the time he was arrested and since he was arrested, did he once even say to the officer or to the Security Guard, or to the District Attorney's Office, "Look, I tell you I didn't do it, but I do know who did do it."

He knew the man's name. Not once, and this goes back since February of 1975.

Now he doesn't have to. I can well imagine. He can stand on his two feet and say "I didn't do it. I am not guilty."

But he did know who these people were. Not once did he disclaim liability by advising the District Attorney's Office of who did do it.

MR. C. LEVINE: May I submit the following?

THE COURT: I say this in passing.

MR. C. LEVINE: If the Court is saying it in passing, the Court has some regard as to the import.

May I just say the following: this man was arrested, brought into Criminal Court, held for the Grand Jury, absent any witnesses; solely on the word of this guy, Jones. He was indicted. He was apprised of the situation against him and came a time when he was unable to offer a plea.

He wasn't able to follow—

MR. J. LEVINE: Objection. This is improper.

MR. C. LEVINE: Non-jury trial. All part of the record.

THE COURT: It's a non-jury trial, I appreciate it.

He was arrested. He was brought down to the Criminal Court, am I correct?

MR. C. LEVINE: Yes.

THE COURT: Where he was held for the Grand Jury?

MR. C. LEVINE: On the testimony of Mr. Jones, and Mr. Jones alone.

THE COURT: Did he have a right to appear before that Grand Jury to plead his innocence and to advise the Grand Jury that he was innocent? Did he or didn't he?

MR. C. LEVINE: Your Honor, he had a right to appear before the Grand Jury.

THE COURT: Yes. He had the right to appear before the Grand Jury and he had to be granted that right.

MR. C. LEVINE: Your Honor—

THE COURT: He was represented by counsel, wasn't he?

MR. C. LEVINE: May I ask this?

THE COURT: What it may seem to you to mean that I am attempting to prove that I am stating that he had to prove his innocence.

MR. C. LEVINE: I cannot see it any other way.

THE COURT: Not from that viewpoint.

MR. C. LEVINE: This Court asked two questions of defense counsel. I appreciate the

that Hawkins had neither protested his innocence to the police, the District Attorney's Office or the Grand Jury, nor come forth and announced the identifies of the actual culprits. After the prosecution summed up, the judge found Hawkins guilty on all four counts of first degree robbery, see N.Y.Penal Law § 160.15 (McKinney 1975). On November 19, 1975, Hawkins was sentenced to an indeterminate prison term of five to fifteen years.

Hawkins appealed his conviction to the Appellate Division of the Supreme Court of New York State, Second Department. He claimed his guilt had not been proved beyond a reasonable doubt and that the state trial court had violated his fifth and fourteenth amendment right to remain silent by having drawn impermissible inferences from his post-arrest silence, citing *Doyle v. Ohio, supra*. The Queens County District Attorney seemingly conceded that the trial judge's actions amounted to a constitutional violation, but argued that such error was harmless. On May 22, 1978, the Appellate Division reduced Hawkins's sentence to two and one-half to seven and one-half years, but upheld the conviction without commenting on Hawkins's claims. *People v. Hawkins*, 63 A.D.2d 719, 405 N.Y.S.2d 128 (2d Dep't 1978). On July 5, 1978, permission to appeal to the New York Court of Appeals was denied. 45 N.Y.2d 780, 409 N.Y.S.2d 1037, 381 N.E.2d 172 (1978) (Wachtler, *J.*).

More than three years later, on July 16, 1981, Hawkins filed a petition for habeas corpus in the United States District Court for the Eastern District of New York, reasserting the two claims he had raised before

the Appellate Division.[6] Judge Platt denied the petition on March 31, 1982. He ruled that Hawkins had not exhausted his reasonable doubt claim because he did not "call attention to or frame his argument in terms of a federal constitutional claim." On May 4, 1983, Judge Oakes, writing for this Court, concluded that Hawkins, by asserting that "[t]he prosecution's case fell quite short of that required to prove appellant's guilt beyond a reasonable doubt," had fairly presented the reasonable doubt claim and alerted the state court of its constitutional nature. *Hawkins v. West*, 706 F.2d 437, 439 (2d Cir.1983). Consequently the exhaustion of state remedies requirement was satisfied, see *Daye v. Attorney General*, 696 F.2d 186 (2d Cir.1982) (en banc), *cert. denied*, —— U.S. ——, 104 S.Ct. 723, 79 L.Ed.2d 184 (1983), and this Court reversed and remanded the case to the district court for its consideration on the merits.

On remand, Judge Wexler—to whom the case had been transferred—denied Hawkins's petition for a writ of habeas corpus. He ruled that Hawkins had waived his post-arrest silence claim by failing to object to the trial court's questions during summation. Moreover, Judge Wexler, citing *Martinez v. Harris*, 675 F.2d 51 (2d Cir. 1982), *cert. denied*, 459 U.S. 849, 103 S.Ct. 109, 74 L.Ed.2d 521 (1982), presumed that the Appellate Division rested its affirmance on a procedural default. The district judge also concluded that it could not be said "that a reasonable trier of facts could not have found petitioner guilty beyond a reasonable doubt on the basis of the evidence

opportunity to discuss the matter with the Court. Two questions. The first concerning—first question concerning why he didn't tell the District Attorney of Queens County who the real guilty people were.

THE COURT: Forget the D.A. Forget the D.A. How about the Grand Jury?

MR. C. LEVINE: The second; this Court is concerned why he did not go before the Grand Jury to testify.

THE COURT: Yet he brought them in to point them out today in his own defense.

MR. C. LEVINE: This is a man who's living in the same House of Detention with two men

who he believes he's standing trial for the crimes they committed.

What is this man to do? Yell "Warden, those are the guys"?

What is he to do? This is no college graduate.

This is no intelligent man. I'm sure the Court was able to ascertain that. He's not completely on the level.

6. The State did not argue that Hawkins had committed a procedural default under state law. Consequently, *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) and its progeny were not cited.

presented." On November 15, 1984, Judge Wexler granted a certificate of probable cause.

## II.

■ Although the law regarding federal habeas corpus review of state criminal convictions has been greatly transformed during the decade of Hawkins's litigation, *see, e.g., Reed v. Ross,* — U.S. —, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984); *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982); *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981); *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), the claims raised on appeal remain unchanged. He urges that the trial judge contravened his fifth and fourteenth amendment rights by drawing impermissible inferences from his post-arrest silence. In addition, Hawkins asserts that his guilt was not proved beyond a reasonable doubt.[7] For purposes of this appeal, we shall address principally the *Doyle* post-arrest silence claim.

■ We believe it will prove helpful to distill Hawkins's multifaceted argument and state our conclusions at the outset. Hawkins asserts that the district judge improperly ruled that he had waived his constitutional claim by failing to object at the state trial to the judge's inquiries into his post-arrest silence. Because New York courts do not require an objection to preserve such a claim, *see People v. McLucas,* 15 N.Y.2d 167, 256 N.Y.S.2d 799, 204 N.E.2d 846 (1965), it would be illogical to presume that, through its silence, the Appellate Division rested its affirmance on a procedural default. Rather, the Appellate Division must have considered Hawkins's constitutional claim on the merits, thereby triggering application of the standards for procedural waiver enunciated in *Wash-*

*ington v. Harris,* 650 F.2d 447 (2d Cir. 1981). Because New York courts refuse to enforce the contemporaneous-objection requirement where a criminal defendant seeks to exercise his privilege against self-incrimination, *see McLucas, supra,* 15 N.Y.2d at 172, 256 N.Y.S.2d at 802, 204 N.E.2d at 848, we conclude that Hawkins is not procedurally barred from raising his constitutional claim.

In turn, Hawkins argues that the trial judge's consideration of his post-arrest silence violated his due process rights protected by the fourteenth amendment. *See Doyle, supra.* We agree. Moreover, in light of the scant indicia of guilt and the magnitude of the error, we do not believe the constitutional violation, even in the context of a bench trial, was "harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

### A. *Procedural Waiver*

In the past few years, we have been confronted with a series of habeas corpus cases pitting the issue of procedural waiver against the right of a criminal defendant to challenge alleged constitutional violations in a federal forum. That our decisions in this area have not proved to be coherent yardsticks is underscored by the district judge's citation of *Martinez v. Harris, supra,* for the proposition that the Appellate Division, in silently affirming a conviction, must be presumed to have rested its affirmance on a procedural default. The scope of this Court's decision in *Martinez,* as we shall explain, does not extend to all factual situations and, in particular, does not control the instant action.

#### i.

In *Martinez,* the defendant claimed that the state trial judge's supplemental charge to the jury violated his due process rights. The defendant, however, failed to object,

---

7. Although federal courts are required to defer to factual determinations made by state courts, this deference is not absolute. *See Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981); *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Viewing the

evidence presented at Hawkins's trial in the light most favorable to the State, we simply do not believe a rational trier of fact could have found the essential elements of first-degree armed robbery beyond a reasonable doubt. *Jackson, supra,* 443 U.S. at 319, 99 S.Ct. at 2789.

and the Appellate Division affirmed his conviction without opinion. The issue before the federal court was "how to interpret the silence" of the Appellate Division when the prosecutor argued for affirmance in the state appellate court both on the merits and on procedural grounds. Writing for this Court, Chief Judge Feinberg noted "we do not believe that the Appellate Division's silence evinces an intent to overlook the procedural error." *Martinez, supra,* 675 F.2d at 54. Accordingly, the due process claim was barred by an adequate and independent state ground absent a showing by the defendant of cause for his failure to object and prejudice from the alleged violation. *See Wainwright v. Sykes, supra,* 433 U.S. at 87–91, 97 S.Ct. at 2506–2509 (1977). In dicta, the Court stated that, where it appears that the Appellate Division decided the case on the merits, there will be "no adequate and independent state ground upon which the state judgment rests ... [and] the federal claim [will be] open for our consideration." *Martinez, supra,* 675 F.2d at 54.

The following year, the reasoning of *Martinez* was applied in *Edwards v. Jones,* 720 F.2d 751 (2d Cir.1983). There, the criminal defendant claimed that the lesser included offense charge that was given by the trial judge, without notice, violated his sixth amendment right "to be informed of the nature and cause of the accusation" against him, as well as his fourteenth amendment right to due process. The defendant, however, failed to register an objection to the charge at trial. In the Appellate Division, the State urged that the conviction be affirmed on procedural grounds and on the merits. We ruled that, "[s]ince the Appellate Division affirmed without opinion, under *Martinez* Edwards's claims are barred from federal habeas corpus review by an adequate and independent state ground...." *Edwards, supra,* 720 F.2d at 754.

In *Edwards,* Judge Newman wrote a separate concurrence to "express [his] respectful disagreement with what [he] believe[s] is an ill-advised application of the forfeiture rule of *Wainwright v. Sykes,* 433 U.S. 72 [97 S.Ct. 2497, 53 L.Ed.2d 594] (1977)." Judge Newman posited a hypothetical case in which be believed it would be illogical and unfair to apply the reasoning of *Martinez* :

What concerns me about the majority's inference from state court silent affirmance in this case is the prospect that in some future case where a procedural default is arguable, but not clear, the Appellate Division will silently affirm after deciding that there was neither procedural default nor a valid claim on the merits, and we will then affirm the denial of habeas corpus relief because we mistakenly presume state court reliance on procedural default even though we think a constitutional error affecting substantial rights has occurred.

*Id.* at 757. These words anticipated a case such as that of Joseph Hawkins.

For a variety of reasons, we are unwilling to presume that, through its silence, the Appellate Division rested its affirmance in this case on a procedural default. Indeed, although we are not absolutely certain,[8] we are confident the Appellate Division affirmed Hawkins's conviction because it believed there was no constitutional error or, if there were such an error, that it was harmless beyond a reasonable doubt.

ii.

■ The New York legislature has adopted a contemporaneous objection rule requiring that an objection or exception to "a ruling or instruction" be lodged "at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same," N.Y.Crim.Proc.Law § 470.05(2) (McKinney 1971).[9] Nevertheless, the use

---

8. We continue to urge the state courts to remove the ambiguity in their summary affirmances by indicating, with a citation to N.Y.Crim.Proc.L. § 470.05(2) (McKinney 1971), their reliance on

procedural default. *See Edwards, supra,* 720 F.2d at 757.

9. Section 470.05(2) reads as follows:

of a criminal defendant's exercise of his privilege against self-incrimination against him at trial is considered a constitutional violation so fundamental that no objection is necessary to preserve such a claim as an issue of law for appellate review.

In *People v. McLucas, supra,* defense counsel failed to object to the trial court's charge that his client's denial of guilt to the police upon arrest did "not take the place of sworn testimony...." *McLucas, supra,* 15 N.Y.2d at 171, 256 N.Y.S.2d at 801, 204 N.E.2d at 848. Despite the absence of an objection, the New York Court of Appeals addressed the merits of the appeal, noting "that no exception is necessary to preserve for appellate review a deprivation of a fundamental constitutional right.... [T]he Trial Judge's remarks on the trial of this present case violated defendant's Federal and State constitutional rights as against self-incrimination and ... the absence of an exception is immaterial." *Id.* at 172, 256 N.Y.S.2d at 802, 204 N.E.2d at 848 (citations omitted).

The particularized import of *McLucas* —that no objection is necessary to preserve for appellate review issues involving the use for impeachment purposes of a criminal defendant's privilege against self-incrimination—retains its vitality. *See Ulster County Court v. Allen,* 442 U.S. 140, 151 n. 10, 99 S.Ct. 2213, 2221 n. 10, 60 L.Ed.2d 777 (1979); *Street v. New York,* 394 U.S. 576, 583–84, 89 S.Ct. 1354, 1361–62, 22 L.Ed.2d 572 (1969); *Washington v. Harris, supra,* 650 F.2d at 451; *Mercado v. Rockefeller,* 502 F.2d 666, 671 (2d Cir. 1974), *cert. denied,* 420 U.S. 925, 95 S.Ct. 1120, 43 L.Ed.2d 394 (1975); *United States ex rel. Schaedel v. Follette,* 447 F.2d 1297, 1300 (2d Cir.1971); *United States ex rel.*

*Vanderhorst v. LaVallee,* 417 F.2d 411, 412 (2d Cir.1969), *cert. denied,* 397 U.S. 925, 90 S.Ct. 930, 25 L.Ed.2d 105 (1970). In *People v. Cavallerio,* 71 A.D.2d 338, 343–44, 422 N.Y.S.2d 691 (1st Dep't, 1979), the Appellate Division cited *McLucas,* noting that a prosecutor's comment on the defendant's failure to testify was "an infringement of so fundamental a right as to be preserved for appellate review even in the absence of an exception." Similarly, in *People v. Bowen,* 65 A.D.2d 364, 411 N.Y. S.2d 573 (1st Dep't, 1978), the Appellate Division, citing *McLucas,* addressed the merits of a claim that a prosecutor improperly questioned a criminal defendant regarding his post-arrest silence, although defense counsel failed to register an objection.

iii.

Having concluded that the courts of New York State have carved out an exception to the general rule that an objection is required to preserve issues of law for appellate review, and that no objection was necessary in this case to preserve Hawkins's constitutional claim for review, we must now examine the applicability of the judicially-created limitations to *McLucas.*

We have held that the *McLucas* rule is inapplicable where defense counsel not only fails to object to the introduction of unconstitutionally obtained evidence, but makes a strategic decision to use the evidence as a means of exculpating his client. *See United States ex rel. Terry v. Henderson,* 462 F.2d 1125, 1130 (2d Cir.1972); *United States ex rel. Vanderhorst, supra,* 417 F.2d at 412; *People v. DeRenzzio,* 19 N.Y.2d 45, 50–51, 277 N.Y.S.2d 668, 670–71, 224 N.E.2d 97, 99 (1966). Though the State

For purposes of appeal, a question of law with respect to a ruling or instruction of a criminal court during a trial or proceeding is presented when a protest thereto was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same. Such protest need not be in the form of an "exception" but is sufficient if the party made his position with respect to the ruling or instruction

known to the court. In addition, a party who without success has either expressly or impliedly sought or requested a particular ruling or instruction, is deemed to have thereby protested the court's ultimate disposition of the matter or failure to rule or instruct accordingly sufficiently to raise a question of law with respect to such disposition or failure regardless of whether any actual protest thereto was registered.

curiously omitted any reference to *McLucas* in its brief, it did suggest implicitly that we construe a snippet of language as constituting a strategic decision by counsel to use his client's post-arrest silence to his advantage. After repeated inquiries by the trial judge into Hawkins's post-arrest silence, Hawkins's counsel stated, "I appreciate the opportunity to discuss this matter with the court." Unlike the State, we read the colloquy between defense counsel and trial judge simply as a lawyer's assiduous efforts to extricate his client from the straits occasioned by a judge's disregard of a fundamental constitutional right. In sum, Hawkins's counsel merely tried to respond politely and make the best of a bad situation.[10]

### iv.

In light of our conclusion that *McLucas* remains good law and that, even in the absence of an objection, Hawkins's constitutional claim is preserved for appellate review, we believe the district judge's reliance on *Martinez* was misplaced. We would characterize as *dubitante* the likelihood that the Appellate Division rested its affirmance in this case on a procedural default. Indeed, the most plausible reading of the silent affirmance is that the Appellate Division, presumably aware of *McLucas* and its progeny, did not even pause to consider procedural default but simply affirmed Hawkins's conviction on the merits. We choose not to extend *Martinez* and presume reliance by a state court on a procedural default, where it appears unlikely that the court rested its affirmance on that ground. Although we sympathize with Justice Jackson's sense of frustration at the veritable flood of frivolous habeas appeals: "He who must search a haystack for a needle is likely to end up with the attitude that the needle is not worth the search," *Brown v. Allen*, 344 U.S. 443, 537, 73 S.Ct. 397, 425, 97 L.Ed.

469 (1953) (Jackson, *J.*, concurring), we believe that if our judicial system is to remain true to its fundamental principles and ideals, it must not bar access to the federal courts by taking refuge in presumptions that may, in certain instances, be divorced from reality. We hold that this case presents such an instance.

### v.

Because there exists no adequate and independent state ground upon which the state judgment rests, this case is controlled by *Washington v. Harris, supra.* There, we held that a criminal defendant must demonstrate cause for his failure to object and prejudice from the alleged violation only where New York actually has a contemporaneous objection requirement for the particular claim raised and this requirement was enforced by the state courts. *See Washington v. Harris, supra,* 650 F.2d at 451. We have already demonstrated that New York courts refuse to enforce the contemporaneous objection requirement where a criminal defendant seeks to exercise his privilege against self-incrimination. Because we agree that there is "no warrant ... for guarding state procedural rules more vigilantly than the State itself does," *id.* at 452, we hold that Hawkins's constitutional claim is open for our consideration. In so concluding, we note that since New York courts have indicated that Hawkins's claim is not barred by a state procedural rule, a federal court implies no disrespect for the state by entertaining the claim.

### B. *Post-Arrest Silence*

Turning, then, to the merits of Hawkins's constitutional claim, we are required today to decide for the first time whether it is unconstitutional for a trial judge to inquire into a criminal defendant's failure to proclaim his innocence during the interregnum between his arrest and his trial. Although *Doyle v. Ohio, supra,* represents

---

10. In addition, the rule of *McLucas* does not extend to jury charges that are susceptible to an interpretation that conveys an unconstitutional standard, *see People v. Thomas*, 50 N.Y.2d 467, 471, 429 N.Y.S.2d 584, 586, 407 N.E.2d 430, 432

(1980); *People v. Robinson*, 36 N.Y.2d 224, 367 N.Y.S.2d 208, 326 N.E.2d 784 (1975). This exception, however, is inapposite to the case at bar.

the touchstone of our analysis,[11] its precise holding is of only limited avail as we strive to reach our ultimate destination.

In *Doyle*, two criminal defendants, after having been given *Miranda* warnings, made no post-arrest statements regarding their involvement in an alleged crime. Each defendant then testified at trial that he had been framed. On cross-examination, the prosecutor asked each why he had not presented his exculpatory explanation to the police upon arrest. The Supreme Court held that "the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." *Doyle, supra*, 426 U.S. at 619, 96 S.Ct. at 2245. Two rationales, grounded in implied contract theory, were adduced by the Court to support this constitutional mandate. First, silence in the wake of the *Miranda* warning is "insolubly ambiguous" because it may signify nothing more than the arrestee's exercise of the rights described by the warnings.[12] *Id.* at 617, 96 S.Ct. at 2244. Moreover, since the *Miranda* warnings convey an implicit assurance to a suspect that his silence will not be used against him, it would be "fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id.* at 618, 96 S.Ct. at 2245.

Although *Doyle* makes clear that the due process clause prohibits the use of a defendant's silence following *Miranda* warnings to impeach his exculpatory story, that conclusion represents merely the beginning of our inquiry, for the facts of this case differ from those operative in *Doyle* in at least three significant respects.

Unlike *Doyle*, this case addresses the use by a trial judge, rather than by a prosecu-tor, of a defendant's post-arrest silence. We believe that this distinction serves to strengthen the claim of constitutional error urged by Hawkins. Although the duty of the prosecutor is to seek justice, and not merely to convict, it must be remembered that prosecutors are armed with and encouraged to employ a repertoire of adversarial accoutrements. Indeed, attempting to impeach a defendant's testimony on cross-examination comports precisely with the truth-seeking function of our adversarial system. As the Supreme Court noted: "An adversary system can maintain neither the reality nor the appearance of efficacy without the assurance that its judgments rest upon a complete illumination of a case rather than a partial or speculative presentation of the facts." *United States v. Nixon*, 418 U.S. 683, 709, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974). Of course, a prosecutor's inquiries into a defendant's post-arrest silence represent a significant and unconstitutional departure from those norms that animate our system of criminal justice. The miscarriage of justice becomes far more grievous, however, where such queries come from the trial judge—the system's bastion of neutrality. Closely affiliated with this concern is the fact that this case involved a bench trial, whereas the trier of fact in *Doyle* was a jury. Although we believe this distinction bears on a determination whether the constitutional error was harmless, *see part II.C., infra*; suffice to say at this juncture that the absence of a jury does not remove the taint.

Most significantly, the Court in *Doyle* confined its holding to the impeachment use of a defendant's silence while under arrest and after having received *Miranda* warnings. In a footnote, the Court explicitly stated that it did not decide whether a defendant's silence "at the preliminary

---

**11.** In light of our belief that this case presents a question of first impression, we are somewhat surprised by the State's concession, *see* Brief for Appellee at 27–28, that the actions of the trial judge in this case violated *Doyle*.

**12.** The notion that post-arrest, post-*Miranda* warning silence was insolubly ambiguous derived from the Court's decision in *United States*

*v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975). There, the Court, exercising its supervisory powers over the lower federal courts, held on nonconstitutional grounds that a defendant's silence at the time of arrest was inadmissible because of its lack of probative value and inherently prejudicial effect.

hearing or any other time prior to the trial[ ]" may be the subject of inquiry, *Doyle, supra,* 426 U.S. at 616 n. 6, 96 S.Ct. at 2244 n. 6.

Because the trial judge probed into Hawkins's failure to proclaim his innocence to not only the arresting police officer—which is a clear constitutional violation under *Doyle* —but also the District Attorney and the Grand Jury, we must decide this unresolved question. Mindful of the twin rationales articulated by the *Doyle* majority, we believe the impeachment use of Hawkins's general failure to come forward and proclaim his innocence or divulge his exculpatory story prior to trial violated his constitutional right to due process.

In particular, we believe that Hawkins's failure to present his alibi defense to the District Attorney or the Grand Jury is no less "insolubly ambiguous" than was his silence at the time of his arrest. The fact that Hawkins was given *Miranda* warnings apprising him that any statements may be used against him; that he enjoyed his fifth amendment privilege against self-incrimination throughout this period; and that he retained counsel who may well have encouraged him to say nothing to the District Attorney or the Grand Jury regarding his exculpatory story only fortifies our belief that Hawkins's silence may simply

have been a product of his exercise of his constitutional rights.[13] The confluence of these factors impels us to the conclusion that, in the face of accusation, Hawkins's silence did not shed its inherent ambiguity. Indeed, under under these circumstances, Hawkins's failure to proffer his exculpatory story prior to trial just as easily may be construed as an indicium of reliance on his right to remain silent as support for the inference that his testimony was a subsequent fabrication.

■ In addition, because Hawkins received *Miranda* warnings advising him that he has the right to remain silent and that anything he says may be used against him, and because his fifth amendment right against self-incrimination assumes the greatest importance following arrest when the suspect is confronted with a direct accusation of criminal conduct, we believe it would vitiate basic notions of elementary fairness and burden a criminal defendant's constitutionally guaranteed right to remain silent if this silence could be cited as the reason an alibi defense should be disbelieved.

■ Accordingly, based upon our reading of *Doyle,*[14] we hold that the trial judge violated the due process clause of the four-

13. Moreover, because Hawkins was incarcerated in the Queens House of Detention with the two individuals he subsequently named as perpetrators, his failure to proclaim his innocence to the District Attorney or testify before the Grand Jury may have been motivated by a valid fear of retribution.

14. Although Hawkins was convicted in late 1975 and *Doyle* was not decided until June 1976, we need not tarry long over *Doyle*'s retroactive effect—an issue the Supreme Court has declined to pass on, *see Anderson v. Charles,* 447 U.S. 404, 407 n. 1, 100 S.Ct. 2180, 2181 n. 1, 65 L.Ed.2d 222 (1980), and one the State has not raised on appeal. The Supreme Court has held that "a change in law with be given effect while a case is on direct review." *Linkletter v. Walker,* 381 U.S. 618, 627, 85 S.Ct. 1731, 1736, 14 L.Ed.2d 601 (1965). Because Hawkins's conviction was under review by the Appellate Division at the time *Doyle* was decided, it appears clear that *Doyle* should be given retroactive effect. *See Price v. King,* 714 F.2d 585, 588 (5th Cir.1983).

In *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), the Court set forth three criteria to guide resolution of the retroactivity question. They are: "(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards." *Id.* at 297, 87 S.Ct. at 1970. The rule of *Doyle* is intended to protect the fairness and reliability of the fact-finding process by excluding inferences that are without probative value and ensuring that a fundamental constitutional right is not burdened. Moreover, any danger that law enforcement authorities would rely on the "old standard" is inapposite here because inquiries into post-arrest silence had never been a proper means of impeaching a defendant's alibi defense and the constitutional transgression was committed not by law enforcement authorities, but by a trial judge. Accordingly, we are convinced that *Doyle* should be given retroactive effect in this case.

teenth amendment by using Hawkins's post-arrest and pre-trial silence to discredit his exculpatory story presented at trial.

## C. *Harmless Constitutional Error*

■ Having concluded that the trial judge's inquiries into Hawkins's post-arrest silence were constitutional error, we must now determine whether such error was "harmless beyond a reasonable doubt," *Chapman, supra,* 386 U.S. at 24, 87 S.Ct. at 828, or whether there exists a reasonable possibility that the error may have contributed to Hawkins's conviction,[15] *see Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 231, 11 L.Ed.2d 171 (1963). *See Kampshoff v. Smith,* 698 F.2d 581 (2d Cir.1983).

Prompted by the realization that an appellate court can almost always discern some "reasonable" possibility that an error influenced a trier of fact, the Supreme Court refined the *Chapman* test in *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). There, the Court declared that "the case against Harrington was so overwhelming that we conclude that this [violation of *Bruton*] was harmless beyond a reasonable doubt." *Id.* at 254, 89 S.Ct. at 1728. Notwithstanding the majority opinion's averments: "We do not depart from *Chapman,* nor do we dilute it by inference. We reaffirm it." *id.,* it is clear that the *Harrington* inquiry is

directed not to the effect of the error on the actual trier of fact but to its "probable impact" on an average trier of fact. *See Kampshoff, supra,* 698 F.2d at 587.[16]

In formulating an efficacious harmless error standard, we are presented with what appears to be an inherent tension. On the one hand, the conservation of judicial resources demands that we tolerate as harmless those errors that involve the "mere etiquette of trials" or procedural formalities. On the other hand, notions of justice require errors that vitiate the substantial rights of litigants or debase the entire judicial process be corrected at all costs, since the trial itself—and hence the judgment— was contaminated. In evaluating the effect of an error on a particular judgment, we are mindful that an appellate court deals only with probabilities, rather than certainties. Nevertheless, it cannot be gainsaid that certain errors—particularly those of constitutional dimension—are more grievous than others. Indeed, even "claims of constitutional error are not fungible." *Rose v. Lundy, supra,* 455 U.S. at 543, 102 S.Ct. at 1216 (Stevens, *J.,* dissenting); *see Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974) (distinguishing cases involving a generalized due process violation from those in which "the State has denied a defendant the benefit of a specific provi-

---

**15.** Although the State urges that Hawkins has the burden of "demonstrat[ing] how he had been prejudiced" by the constitutional error, *see* Brief for Appellee at 27, we believe the law is well-settled that the burden rests on the State to prove the error was harmless. In *Chapman,* the Court noted that constitutional error "casts on someone other than the person prejudiced by it a burden to show that it was harmless. It is for that reason that the original common-law harmless error rule put the burden on the beneficiary of the error either to prove that there was no injury or to suffer a reversal of his erroneously obtained judgment." *Chapman, supra,* 386 U.S. at 24, 87 S.Ct. at 828.

**16.** Writing for the Court in *Kampshoff,* Judge Oakes comprehensively examined the concept of harmless constitutional error, noting the subtle reformulations adopted by the Court after *Chapman* and *Harrington.* For example, in

*Schneble v. Florida,* 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972), the Court stated that "unless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction, reversal is not required." *Id.* at 432, 92 S.Ct. at 1060. *See also Hopper v. Evans,* 456 U.S. 605, 613, 102 S.Ct. 2049, 2054, 72 L.Ed.2d 367 (1982) ("the [error] did not prejudice respondent in any way, and a new trial is not warranted. *See Chapman v. California,* 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705] (1967)."); *Parker v. Randolph,* 442 U.S. 62, 70– 71, 99 S.Ct. 2132, 2137–2138, 60 L.Ed.2d 713 (1979) ("In some cases, the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the co-defendant's admission so insignificant by comparison, that it is clear beyond a reasonable doubt that introduction of the admission at trial was harmless error.").

sion of the Bill of Rights ... or in which the prosecutor's remarks so prejudiced a specific right ... as to amount to a denial of that right.")

Therefore, although there exists a unitary test of harmlessness for all constitutional errors, our appraisal of a particular error's impact necessarily depends on the nature of the violation in the context of a given factual setting. Only in light of these dual considerations can we confidently evaluate the likelihood that an error infected the validity of the underlying judgment or the integrity of the process by which that judgment was obtained.

It is against this backdrop that we now turn to examine whether the trial judge's unconstitutional consideration of Hawkins's post-arrest silence was harmless beyond a reasonable doubt. As we noted on the prior appeal, "the only evidence tying Hawkins to the crime was the direct identification testimony of the security guard, Jones. Hawkins presented evidence from a Legal Aid investigation tending to show that the security guard could not have seen the robbery from where he stood...." *Hawkins, supra,* 706 F.2d at 440 n. 1. Except for the improbable identification testimony proffered by Jones,[17] the remaining evidence was entirely exculpatory. Indeed, the robbery victims themselves cast doubt on Hawkins's guilt. Moreover, Hawkins presented an alibi that was largely substantiated by the testimony of Robin Bates. Thus, despite the State's repeated allusions to a "sea of inculpatory evidence," *see* Brief for Appellee at 28, we believe the evidence pointing to Hawkins's guilt amounted to, at most, a "puddle." In sum, finding the evidence marshalled by the State against Hawkins to be tenuous, we simply cannot conclude beyond a reasonable doubt that the trial judge would have reached the same verdict without using Hawkins's post-arrest silence to impeach the credibility of his alibi defense and, consequently, infer his guilt.

We pause to comment briefly upon the implications arising from the fact that the constitutional érror occurred in the context of a bench trial. Our system of justice presumes that judges enjoy the capacity to consider only relevant evidence in determining an individual's guilt or innocence. We vest judges with the authority to grant motions to suppress improperly seized evidence, while at the same time empowering them to pass on an individual's guilt, confident that the inculpatory evidence will remain outside their decisional calculus. But there comes a point where we are unable to indulge in the comfortable fiction that judges can edit their thought processes to exclude that which is impermissible and include only that which is permissible. In the present case, we believe the trial judge transgressed proper bounds by employing Hawkins's post-arrest silence as a lever with which he could cast doubt on Hawkins's credibility, as well as on his innocence. Although we candidly recognize that it is hardly possible for an appellate court to ferret out what subjective factors, if any, entered into a trial judge's ultimate determination, we are constrained to conclude that the trial judge's repeated references to Hawkins's silence reflected his thought processes. Moreover, we are unable to shut our eyes to the trial judge's premature pronouncement of Hawkins's guilt, the pernicious effects of which were not cured when the judge apologized for "jumping the gun." Insofar as an efficacious harmless error standard evinces a sensitivity to the imprint a particular error

---

17. Professor Wigmore has suggested that eyewitness testimony, in some instances, may be the least trustworthy means of identifying the guilty. *See* 3 J. Wigmore, *Evidence* § 786(a) (1970). Numerous other scholars, as well as this Court, *see Kampshoff v. Smith, supra,* 698 F.2d at 585–87, are in accord with this view. *See* E. Loftus, *Eyewitness Testimony* (1979);

O'Connor, "That's The Man": A Sobering Study of Eyewitness Identification and The Polygraph, 49 St. John's L.Rev. 1 (1974); Levine & Tapp, "The Psychology of Criminal Identification: The Gap from *Wade* to *Kirby*," 121 U.Penn.L.Rev. 1079 (1973); Wall, *Eye-Witness Identification in Criminal Cases* (1965).

leaves on the judicial process, the trial judge's contravention of fundamental constitutional rights cannot be dismissed as harmless.

■ Consequently, given the scant indicia of Hawkins's guilt and the grievous nature of the constitutional error, we hold that the trial court's inquiries into Hawkins's post-arrest silence were not harmless.

### III.

When a case is tried without a jury, it is reasonable to expect the judge to make an extra effort to be fair and avoid even the appearance of unfairness. This was not done here. The judge's premature pronouncement of guilt, exposing his rush to convict, and his improper comments on the defendant's post-arrest silence, lead us to conclude that this conviction lacked fundamental fairness and, thus, violated the due process clause of the Constitution. It cannot stand.

Accordingly, the judgment of the district court denying the petition for habeas corpus is reversed. The case is remanded with instructions to issue the writ of habeas corpus, unless within 30 days from the date of this opinion the State moves to resentence Hawkins as a first-time felony offender.[18]

---

**18.** Hawkins's conviction for first-degree robbery served as a predicate felony for his sentencing in late 1980 as a second-felony offender on a sodomy charge—his sodomy conviction is not involved in this appeal. *See* N.Y.Penal Law § 70.06 (McKinney 1975). He has completed serving his first sentence.