**Felipe GARCIA, Petitioner,**

**v.**

**WARDEN, DANNEMORA CORRECTIONAL FACILITY,[1] Respondent.**

**No. 81 Civ. 3534 (WCC).**

United States District Court,
S.D. New York.

July 18, 1985.

---

**1.** Although petitioner names the "Warden" of "Dannemora Correctional Facility" as the re-

J. Jeffrey Weisenfeld, New York City, for petitioner.

Robert M. Morgenthau, Dist. Atty., for New York County, New York City, for respondent; Norman Barclay, Carol Ethridge Gette, Asst. Dist. Attys., New York City, of counsel.

OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

Petitioner Felipe Garcia ("Garcia") was tried and convicted of four counts of second degree murder by a jury sitting in New York Supreme Court, New York County. On May 23, 1978, he was sentenced to four concurrent indeterminate prison terms of twenty years to life. Garcia appealed, and on February 3, 1981, the Appellate Division of the New York Supreme Court unanimously affirmed his conviction without opinion. *People v. Garcia*, 80 A.D.2d 753, 436 N.Y.S.2d 906 (1st Dept.1981). The New York Court of Appeals subsequently denied him leave to appeal.

In June of 1981, Garcia petitioned this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He argued that he had been deprived of due process in that:

spondent in this action, the appropriate respondent is Eugene LeFevre, Superintendent of Clin-

ton Correctional Facility. Clinton Correctional Facility is located in Dannemora, New York.

(1) no reasonable jury could have convicted him based on the evidence presented at trial; (2) the trial judge impermissibly intruded into the court proceedings and thereby deprived him of a fair trial; and (3) the jury charge on intent impermissibly shifted the burden of proof to the defense, contrary to the United States Supreme Court's ruling in *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).

In an Opinion and Order dated October 9, 1981, I ruled that petitioner had failed to exhaust his state remedies with respect to the first and second claims because he had failed to present them to the state appellate courts in constitutional terms. I also found that his failure to object to the jury charge at trial barred him from raising his third claim in this Court. I therefore dismissed the petition.

Shortly after I issued my Opinion and Order, the Court of Appeals for the Second Circuit ruled that where a defendant has failed specifically to frame his claims in federal constitutional terms on direct appeal, his state remedies will nonetheless be deemed exhausted if he relied in his argument on state cases employing a constitutional analysis. *Daye v. Attorney General of the State of New York*, 696 F.2d 186, 194 (2d Cir.1982) (*en banc*).[2] After the decision in *Daye* was announced, Garcia was granted a certificate of probable cause to appeal from the order dismissing his petition. He subsequently filed an appeal challenging this Court's rulings with respect to exhaustion of his first and second claims, and on the basis of the new authority, the Court of Appeals found that petitioner had effectively exhausted his state remedies on the insufficiency and interference claims. Accordingly, the court remanded these two issues for further consideration.

The parties have once again addressed the sufficiency of the evidence adduced at Garcia's trial and the prejudice allegedly resulting from intrusions by the trial judge. For the reasons below, I reject petitioner's arguments, and once again conclude that the petition must be dismissed.

## I. *Sufficiency of the Evidence*

■ A defendant challenging the sufficiency of the evidence adduced at his state criminal trial is entitled to habeas corpus relief in federal court only if the court finds that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 2791, 61 L.Ed.2d 560 (1979). The federal court does not perform its own independent evaluation of the evidence; rather, it must view the record in the light most favorable to the prosecution. *Id.* at 319, 99 S.Ct. at 2789. Under this standard, Garcia's insufficiency argument is clearly without merit.

■ During Garcia's trial, the People of the State of New York ("the People") introduced the following evidence in their direct case: On the morning of February 13, 1977, Collins Monden and Phillip Moulton-Peddie were shot and killed in the small vestibule of an apartment building on 147th Street in Harlem. Both victims were shot with a .38 caliber revolver, and jewelry worth $4,000 was taken from Monden.

The vestibule was located just inside the front door of the building, and was separated from the main lobby by a locked door. The superintendent testified that no one could leave or enter the building except through the front door and the vestibule.

Sonia Tarleton, a friend of Monden's, testified that on the night of the murders, she, Monden and Moulton-Peddie had met at a nightclub and decided to buy cocaine. Monden approached Garcia—who was wearing a black suit and a white shirt with an open collar—about a possible purchase. Tarleton, Monden, Moulton-Peddie, Garcia, and Garcia's girlfriend then left the club together, and went to 147th Street. Tarle-

---

**2.** The court in *Daye* reasoned that the cases cited to the state appellate courts gave them a fair opportunity to pass upon the federal claims, and thus provided the effective equivalent of exhaustion of state remedies. *Daye*, 696 F.2d at 195.

ton testified that she sat in Monden's car, directly across the street from the building where the murders occurred, while the others walked up the block to make a phone call. Soon thereafter, they returned and entered the building through the front door. Tarleton testified that from this point forward she kept a constant watch on the front door of the apartment building.

Tarleton testified that she saw Garcia's girlfriend leave the building and walk away. Two minutes later, Garcia emerged, met his girlfriend (who by this time was moving back toward the building), and walked away with her. Tarleton next saw a woman step out the front door of the building and attract the attention of a man passing on the street. At this point Tarleton left her car and entered the vestibule, where she discovered the bodies. She testified that she had not seen anyone enter the building other than Garcia, Garcia's girlfriend, and the two victims. Her car windows had been closed, and she had heard no gunshots.

Two tenants of the building, Marie Lyons and Florence Carrington, testified that they did hear gunshots. Lyons heard two shots, went to her window, and saw a man wearing a dark suit with an open shirt collar leaving the building. Carrington heard the shots, raced downstairs, and discovered the bodies of the victims in the vestibule. She notified the superintendent, then returned to the lobby, went through the vestibule and out the front door in order to summon help. She flagged a passerby, told him to notify the police, then went to Lyons's apartment, where she learned that Lyons had already called the police. Police arrived shortly thereafter and found the bodies.

Garcia was subsequently arrested and charged with both murders.[3] On April 1, 1977, he gave a New York City Police Department detective a sworn account of his whereabouts on February 13th, and at trial, the prosecution read into the record stenotyped notes of that statement. Garcia did not deny being in the vestibule with the victims, but his account of the events included a fifth person, one Raymond Ventura. Garcia said that he was about to sell drugs to Monden and Moulten-Peddie when Ventura entered the vestibule, told Garcia there would be no transaction, and ordered Garcia and his girlfriend to leave. Garcia maintained that he complied with Ventura's order and was about forty-five feet from the building when he heard two gunshots. He kept walking. Garcia said that he saw Ventura two days later, and at that time Ventura admitted murdering the two men.

After the People rested, the defense adduced the following evidence: An individual named Marino Jimenez testified that he had overheard a conversation between Garcia and Ventura in a nightclub washroom, during which Ventura admitted the murders. Jimenez also testified that Ventura told Garcia he had killed Monden and Moulton-Peddie because they owed him money. According to Jimenez, neither Garcia nor Ventura appeared to be aware of his presence during this conversation. Jimenez testified that he came forward with this information upon learning Garcia was to be tried for the two murders, one month before the trial was scheduled to begin.

The prosecution vigorously cross-examined Jimenez in hopes of establishing that his story of Ventura's restroom confession was a total fabrication. It established that Jimenez was a confidential informant for the New York City Police Department at the time he overheard the alleged conversation, but that he did not immediately report this conversation to the police, as he might have been expected to do. Moreover, when later arrested for an unrelated offense, he did not attempt to trade on this information as he had done on a previous occasion. The prosecution also established that five months prior to Garcia's trial, Jimenez and Garcia had been confined together and had engaged in conversation. Jimenez admit-

---

**3.** Garcia was charged with and convicted of two counts of intentional murder and two counts of felony murder.

ted that they talked about Ventura, but denied that they talked about Garcia's case. The defense also called Ventura, who testified under a limited testimonial immunity that he was never inside the vestibule on the morning of the murders. At the conclusion of Ventura's testimony, the defense rested.

In support of his challenge to the sufficiency of the evidence, petitioner now argues that his account of events surrounding the murders is undeniably accurate. According to petitioner, inconsistencies in Tarleton's testimony conclusively demonstrate that she was an inattentive witness, and that she therefore failed to see Ventura enter and exit the building. Petitioner argues further that no reasonable jury could have failed to credit Jimenez's testimony. I find these arguments wholly meritless.

Petitioner asserts that Tarleton focused only on the comings and goings of Garcia, Garcia's girlfriend, and the two victims, and that this preoccupation prevented her from observing Ventura's movements at the murder scene. In support of this argument, petitioner highlights conflicts in Tarleton's testimony. He cites Tarleton's statement that she saw Garcia and his girlfriend flee the murder scene together, and compares it with Lyons's testimony that after she heard the shots, she saw a man leave the building alone. He also points to Carrington's testimony that the stranger she flagged down in the street never left the front of the building, and contrasts it with Tarleton's statement that the stranger left briefly and returned with police assistance. According to petitioner, these inconsistencies thoroughly undermine Tarleton's testimony, and devastate the prosecution's case against Garcia.

I have carefully reviewed the evidence and it is obvious to me that Tarleton's testimony is not materially inconsistent with either Lyons's testimony or Carrington's testimony. Lyons could have seen Garcia immediately after the shots were fired, just as he walked out the door and before he met his girlfriend on the street.

It is also quite possible that while Carrington rushed from the front of the building to Lyons's apartment, the stranger she had stopped left momentarily, found a policeman, and quickly returned to the murder scene without Carrington having realized he was gone. The apparent inconsistencies noted by petitioner may reflect only the different perspectives from which the witnesses viewed the critical events, and certainly do not lead inescapably to the conclusion that Tarleton was inattentive. Tarleton testified that she carefully watched the building. Even if she had been distracted briefly, it seems to me highly unlikely she would have overlooked both Ventura's entrance into the building and his exit. Apparently the jury reached a similar conclusion.

Petitioner's second argument, that no reasonable jury could have found Garcia guilty beyond a reasonable doubt after hearing Jimenez's testimony, is also without merit. Jimenez's credibility was substantially impeached on cross-examination, first by evidence of his prior criminal record, and second, by his admitted failure to try to capitalize on his purported knowledge during criminal proceedings against him. Moreover, evidence of Jimenez's conversation with Garcia five months prior to the trial added to the possibility that he fabricated his account at Garcia's behest. When all the evidence is viewed in the light most favorable to the prosecution, it is obvious that the jury could properly have rejected Jimenez's testimony in its entirety.

I have reviewed the summations given by both trial counsel, and I am satisfied that the issues raised here were placed squarely before the jury for its consideration. Tr. at 1826–1838, 1909–1915. The jury obviously rejected petitioner's view of Tarleton's reliability and Jimenez's credibility, and I conclude that there was ample evidence upon which it could rationally do so. Accordingly, I reject the argument that the evidence was insufficient to prove Garcia guilty beyond a reasonable doubt.

## Judicial Intrusion

Petitioner's second argument is that the trial judge impermissibly intruded into the trial process by making faces to express his disbelief of defense witnesses, taking control of the questioning, interrogating defense witnesses in such a sarcastic tone as to "destroy" their testimony, and marshalling the evidence in a manner which bolstered the People's case and left the jury "with the clear impression that the court felt Garcia was guilty." Pet.Mem. at 8. According to petitioner, this excessive and biased intrusion deprived him of a fair and impartial trial.

Petitioner raised precisely this argument on his direct appeal, and the People responded that he was procedurally barred from raising the claim because he had failed to interpose a contemporaneous objection as required under New York Criminal Procedure Law § 470.05(2). The People argued, alternatively, that the claim should be denied on its merits. The Appellate Division subsequently affirmed Garcia's conviction without opinion, and under the law of this circuit, the Court is to presume that the state appellate court relied on the procedural grounds rather than reaching the merits. *See, e.g., Martinez v. Harris,* 675 F.2d 51, 54 (2d Cir.1982).

■ It is well-settled that where a state court has refused to consider the merits of a claim because of a procedural default on the part of the defendant, federal habeas corpus review is unavailable absent a showing of both cause for the default and "actual prejudice" arising from the error. *Wainwright v. Sykes,* 433 U.S. 72, 84–91, 97 S.Ct. 2497, 2505–2509, 53 L.Ed.2d 594 (1972). Despite respondent's thorough discussion of the *Wainwright* cause and prejudice standard in his memorandum of law, petitioner has declined specifically to address these arguments in either his memorandum-in-chief or his reply memorandum. Under the circumstances, it hardly seems appropriate for the Court to scour the record in search of some justification for petitioner's default, or to construct an "actual prejudice" argument for him. I therefore note below only a few factors which lead me to conclude that Garcia would be unable to make the requisite showing, and that his petition should be denied.

■ There is no denying that the judge was quite actively involved in Garcia's trial. Nonetheless, judicial intervention is not forbidden and, at times, it is necessary to an orderly and efficient presentation of the evidence. For this reason, it is important that defense counsel object when he or she perceives that the judge has overstepped the bounds of propriety. Defense counsel in this case was by no means oblivious to that obligation. Early in the trial, he mentioned that he had done appellate work and therefore fully understood the importance of making a record for review. Thereafter, he did raise numerous objections; in fact, on several isolated occasions he objected to leading questions put to the witnesses by the judge, and once he objected to a face the judge had made. At no time did he suggest, however, that the judge had embarked on a course which was "excessive" or "biased," and which conveyed his belief that petitioner was guilty. On at least one occasion, counsel even *encouraged* the judge to become involved in the examination of a defense witness.[4] In light of these factors, I can only conclude that if counsel had thought there was reason to object to the judge's general course of conduct, he would have done so without hesitation.

---

**4.** Immediately prior to Ventura's testimony, the following colloquy occurred:

> The Court: What is your application?
> Defense Counsel: That I anticipate that this is going to be a recalcitrant witness, a hostile witness, and I would ask for some leeway in questioning, and also, actually, the Court's aid regarding eliciting his testimony.

> The Court: You want me to participate and intrude in the questioning in order to get information?
> Defense Counsel: If you see it is getting difficult.
> The Court: I will be happy to assist you in that regard.
> Tr. at 1704–05.

I am thoroughly unpersuaded by petitioner's argument that he was not aware he had to object to the general course of the judge's conduct, as opposed to specific questions or comments, in order to preserve his constitutional claim. He relies on the fact that his trial occurred before the New York Court of Appeals issued its memorandum opinion in *People v. Charleston*, 56 N.Y.2d 886, 453 N.Y.S.2d 399, 438 N.E.2d 1114 (1982), holding that by directing objections only to specific questions interposed by the trial judge, the defendant had failed to preserve his claim that excessive judicial intrusion deprived him of a fair trial. In Garcia's case, as in *Charleston*, defense counsel simply could not have assumed that by objecting to specific questions or comments, he was apprising the judge of the real nature of the allegedly prejudicial conduct. Moreover, as the United States Supreme Court has indicated:

> [T]he Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim. Where the basis of a constitutional claim is available, and other defense counsel have perceived and litigated that claim, the demands of comity and finality counsel against labeling alleged unawareness of the objection as cause for a procedural default.

*Engle v. Isaac*, 456 U.S. 107, 134, 102 S.Ct. 1558, 1575, 71 L.Ed.2d 783 (1982) (citation omitted).

To the extent that petitioner hopes to establish cause for his default by pointing to the appellate "track record" of this particular judge—a record which includes numerous rebukes and reversals for precisely the sort of conduct complained of here—and arguing therefrom that the judge needed no warning, the reasoning is not persuasive. If the trial judge has a long history of prejudicial behavior, that should increase, rather than diminish, the need for registering objection at any early indication that the pattern might be repeated.

I note, finally, that petitioner would be hard pressed to demonstrate sufficient actual prejudice to meet the *Wainwright v. Sykes* standard. Trial counsel did object, at one point, to a facial expression he observed the judge make. The judge denied making a face, and offered to poll the jury to see whether they had perceived such an expression. Counsel declined to take advantage of this offer and never suggested that the judge give any cautionary instruction instead. From this I can only conclude that counsel did not consider the conduct especially prejudicial. With respect to the interrogation of witnesses by the Court, the following instruction was given to the jury at the close of the trial:

> The fact that I pose questions to a witness does not indicate that I have any opinion with regard to the facts in this case, nor does it indicate that I have any opinion with regard to the unbelievability or lack of believability to that which the witness has testified. I ask those questions in order to clarify and enlighten the issues in this case for you.

Tr. at 1941.

■ For all of the foregoing reasons, I conclude that petitioner has demonstrated neither cause nor prejudice sufficient to excuse his procedural default, as he must under *Wainwright v. Sykes*. Accordingly, the petition is dismissed.

SO ORDERED.