1528

Kenneth GILMORE, Jr., Petitioner,

v.

Robert J. HENDERSON, Superintendent,
Auburn Correctional Facility,
Respondent.

No. 86 CV 1009(ERN).

United States District Court,
E.D. New York.

Nov. 7, 1986.

Martin B. Adelman, New York City, for petitioner.

Elizabeth Holtzman, Dist. Atty., Kings County, Brooklyn, N.Y. by Richard T. Faughnan, Asst. Dist. Atty., for respondent.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

After a fourth trial in 1981 [1], petitioner, a State prisoner, was convicted and is serving concurrent sentences of 25 years to life

1. Two prior trials ending in conviction were set aside due to errors by court or prosecutorial personnel. A third trial terminated in a mistrial.

for murder in the second degree, 7½ to 15 years for attempted murder in the second degree, and 3½ to 7 years for criminal possession of a weapon. By memorandum decision, the New York Court of Appeals affirmed the convictions and sentences, Judge Meyer dissenting, *People v. Gilmore*, 66 N.Y.2d 863, 498 N.Y.S.2d 752, 489 N.E.2d 721 (1985).[2] Petitioner now seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

The charges against petitioner arose out of a shooting in the early morning of Sunday, June 6, 1976, resulting in the death of Theodore Gross and the wounding of Gross' female companion, Melita Sneed. Petitioner was then employed for over a year as night manager of Webster Bowling Lanes in the Bronx, although he resided in Brooklyn. He and Gross were friends growing out of Gross' participation in a bowling league at Webster Lanes; and after petitioner closed up at 4:00 A.M., Gross offered to drive him and a newly hired shorthand cook, George Murdock, to Brooklyn in Gross' Citroen automobile. After a brief stop at an early hours club in the Bronx, the group proceeded to downtown Brooklyn. Sneed occupied the front right passenger seat next to Gross; petitioner, the left rear seat behind Gross, and Murdock, the right rear seat behind Sneed. As the car neared Flatbush Avenue, petitioner asked Gross to stop at another after hours club called "Tears of Darkness", located on Flatbush Avenue near petitioner's home, saying he wanted to pick up some money he was owed. Gross agreed but he and Sneed remained in the car, and ran it through a nearby car wash. Petitioner and Murdock returned in 20 or 25 minutes and the group drove off.

According to Sneed, petitioner then said "Pull alongside right here," which Sneed described as "like a little street, like a junction ..." When the car stopped, she saw petitioner "bending over," and saying something about "Let me check my pistol" or "Let me check my gun," but then said "I don't really remember, but it was something to that effect ..." Then she heard "this loud noise, and there was a hole in the windshield" and she "saw blood, my hand was bleeding ..." She jumped out of the car and tried to summon help but no one responded, so she sat in the car until the police and an ambulance came and took her to Cumberland Hospital.

Murdock, who was then on parole for a robbery conviction, testified for the prosecution. He said that while he and petitioner were in the "Tears of Darkness" club, petitioner said "he was going to kill Ted Gross and the girl," and that "If I want to come I could come; if I didn't, he'd respect me for that." On their return to Gross' car, they resumed the same seats: petitioner behind Gross and Murdock behind Sneed. As the car began moving, petitioner asked Gross "Do you want to drop Musah [meaning Murdock] off at the bus stop?" Murdock then saw petitioner "bending down. When he came up, I just heard shots." Murdock opened the door, as the car was then moving back, and jumped out carrying his green bag and ran up the street. He saw petitioner run past him carrying a brown burlap bag. They ran to a subway, took a train one stop and then caught a cab, and finally Murdock took a train to his girlfriend's house in Queens. He went to work on Monday and Tuesday and, after a telephone call and visit with his parole officer, he agreed to give a statement to the police which inculpated petitioner as the killer.

Petitioner, testifying in his own behalf, denied shooting Gross or Sneed, asserting that Gross had helped him get his job at Webster Bowling Lanes. He denied that he had a brown bag and said it was Murdock who pulled a gun out of his bag and shot Gross. According to petitioner, Murdock then pointed the gun at his chest and said: "You seen what just happened to Ted. If you don't keep your mouth shut,

---

**2.** "Tr." references are to the trial transcript, "H.Tr." references are to a transcript of pretrial hearings dated March 22, 1977, and "App." references are to the Appendix submitted to the New York Court of Appeals.

you're going to get the same thing", ordering petitioner to follow him out the right side of the car, when petitioner went to get out on the left side. According to petitioner, it was Murdock who directed the escape route, reminding petitioner to "keep my mouth shut."

Later that day (Sunday) petitioner attended a christening and learned from his sister that police armed with shotguns were looking for him. Petitioner decided to take a bus to Charleston, South Carolina, where, accompanied by his uncle, he surrendered voluntarily to a family friend, Sergeant Gathers, who arranged with New York police for petitioner's waiver of extradition and return to New York.

## Petitioner's Contentions

### I.

■ Petitioner contends that the prosecutor elicited his post arrest silence on the State's direct case contrary to *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). Despite the absence of an objection, he asserts that the error is of constitutional dimension, citing *People v. Kinchen*, 60 N.Y.2d 772, 469 N.Y.S.2d 680, 457 N.E.2d 786 (1983) (memorandum), and not subject to harmless error analysis, relying on *Chapman v. California*, 386 U.S. 18, 22–24, 87 S.Ct. 824, 827–828, 17 L.Ed.2d 705 (1967). Petitioner also points out that the Appellate Division had reversed a prior conviction in this matter because the same prosecutor, on cross-examining petitioner, also elicited his post arrest silence. *People v. Gilmore*, 76 A.D.2d 548, 430 N.Y.S.2d 854 (2d Dept.1980).

While defense counsel's failure to object may be attributed to a desire to avoid underscoring prejudicial testimony in the jurors' minds by drawing attention to it, *Williams v. Henderson*, 451 F.Supp. 328, 331 n. 5 (E.D.N.Y.1978), *aff'd.* 584 F.2d 974 (2d Cir.1978), this explanation is unavailing. Defense counsel raised the same matter on cross-examination, Tr. 223–24, leaving petitioner in a poor position to complain. *See United States v. Nunez-Rios*, 622 F.2d 1093, 1101 (2d Cir.1980); *cf. People v. Sea-*

*ton*, 119 A.D.2d 600, 500 N.Y.S.2d 771, 772 (2d Dept.1986) (memorandum).

The New York Court of Appeals ended its memorandum decision stating,

"Defendant's remaining arguments, to the extent that they have been preserved for our review, are without merit."

498 N.Y.S.2d at 754.

The State, as a basis for affirmance, had urged petitioner's procedural default in failing to object. In such a situation,

"[t]he teaching of prior cases of this [federal] Court is that when (a) the defendant has failed to follow prescribed state procedures in the trial court to raise a constitutional issue, (b) he thereafter attempts to raise the constitutional issue on appeal to the state appellate court, (c) the State objects to his raising the constitutional question because of the failure properly to preserve the question for appellate review, and (d) the state appellate court affirms the defendant's conviction without stating whether it has rejected the constitutional claim on its merits or on the ground of the procedural default, the federal habeas corpus court should normally interpret the state appellate court's ruling as one based on the procedural default. Although this principle was developed in cases in which the state appellate court had simply affirmed convictions without opinion, it is equally applicable to an affirmance in an opinion that does not address the constitutional claim."

*Stepney v. Lopes*, 760 F.2d 40, 44 (2d Cir. 1985) (citations omitted).

Writing for the Court in *Hawkins v. LeFevre*, 758 F.2d 866 (2d Cir.1985), Judge Kaufman reviewed the cases and concluded that New York courts do not require an objection to preserve errors concerning reference to the accused's post arrest silence, *id.* at 871, relying on *People v. McLucas*, 15 N.Y.2d 167, 256 N.Y.S.2d 799, 204 N.E.2d 846 (1965), and also citing *People v. Bowen*, 65 A.D.2d 364, 411 N.Y.S.2d 573 (1st Dept.1978). In *Bowen*, despite the absence of an objection, the Appellate Division, also citing *McLucas*, considered the

defendant's complaint that the prosecutor had been allowed to question him about his post arrest silence. Ultimately, the Court rejected the merits of the claim and further noted that the error, if any, was harmless beyond a reasonable doubt. 411 N.Y.S.2d at 577. In affirming the Appellate Division, the Court of Appeals stated,

> "Appellant tenders two issues. With respect to the first—the propriety of the prosecutor's cross-examination of defendant as to his failure at the time of his arrest to come forward with the exculpatory version of the episode to which he testified on trial—it appears that the issue is not preserved for our review inasmuch as no timely protest was registered."

*People v. Bowen*, 50 N.Y.2d 915, 917, 431 N.Y.S.2d 449, 409 N.E.2d 924 (1980) (memorandum).

Despite his extensive review of the cases, Judge Kaufman in *Hawkins* neither cited nor referred to the Court of Appeals' decision in *Bowen*, which obviously refuses to extend *McLucas* to the improper use of the accused's post arrest silence. In *McLucas* the Court had ruled that no objection was necessary to preserve error concerning the trial court's improper comment on the accused's failure to testify in his own defense. While related, the two situations are not identical.

In light of *Bowen* and the Court of Appeals' invocation of waiver in petitioner's case, this Court finds that the Court of Appeals rejected this claim of error on procedural grounds.

> "Petitioner's procedural default in state court precludes him from raising the issue in a federal habeas proceeding unless he is able to show cause and prejudice."

*Cantone v. Superintendent, etc.*, 759 F.2d 207, 218 (2d Cir.1985). Petitioner has not addressed the cause and prejudice requirement, hence the record does not entitle him to a writ on this ground.

## II.

■ Petitioner next contends that witness Bobby Glover was an agent of the police, who elicited a confession from him while he was in custody and represented by counsel. At trial Glover testified as follows,

> "A  On that specific date [June 16, 1976] we were on the fourth floor in this building. When I saw him, Mr. Gilmore, I asked him point blank, how did it look for him, meaning, how did the case look, and he stated that it didn't look too good because there were two people that could put him away for the killing of Ted Gross, a male and female; and he asked me would I be getting out anytime soon, and I told him I was hopeful, which led me to his next question as to whether I would contact someone about some moneys, in reference to, you know, me being paid for killing the people so they wouldn't testify against him. He said that I would be given a phone number to call someone to speak with them in reference to the money, and it would be set up from there.

> "Q  Did you have any further conversation with respect to anything else, in a place out of the city involving the deceased, anything further?

> "A  Yes. I had asked him how he had killed Ted, and he said Ted was screwing up the money from the narcotics. He wasn't paying his debts, and the weight was coming down on him. He was catching flack from the people he was under, his bosses, and that he had to do something about it; that he had brought it to Ted's attention previously, but he hadn't, Ted hadn't done anything, you know, to correct it, and that he had no other choice. As I recall, that same day he was somewhat reluctant to go before a grand jury because he didn't feel competent, he didn't feel that his defense attorney at that particular time was confident—or competent enough to represent him. He later stated to me, related to me that he had fled New York enroute to South Carolina where he had gone to stay at a friend's house, or a relative's house.

"While there he was in a part of the house where people were frequently coming and going, and as people would come and go, he would leave the room, and he got tired of jumping up, walking from one part of the house to the other part of the house, so he elected to stay there, and upon doing so a police sergeant on the force in that town came in and saw him and stated to him—[objection argued] 'You're the guy that fled New York for murder. You're wanted for murder in New York.'

"At that time Mr. Gilmore said that he asked the sergeant could he speak with him in private, which he allowed him to do so. He stated that he had offered the sergeant $10,000 cash money then on the spot to just forget that he had seen him period. That he would leave the premises immediately. The sergeant told him, 'No, I can't do that, but I'll give you something like the benefit of the doubt by saying that you turned, when we get to the station, after I arrest you and we get to the station, I'll let it be known that you turned yourself in to me.'"

Tr. 298–301.

Petitioner denied that he knew Glover and that any conversation with Glover had occurred. Apposite in that situation is the Supreme Court's recent comment in *Kuhlmann v. Wilson*, —— U.S. ——, 106 S.Ct. 2616, 2630, 91 L.Ed.2d 364 (1986):

"As our recent examination of this Sixth Amendment issue in [*Maine v. Moulton*, —— U.S. ——, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985)] makes clear, the primary concern of the *Massiah* [*v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964)] line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation. Since 'the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached,' [106 S.Ct. at 487], citing *United States v. Henry*, [447 U.S. 264] at 276 [100 S.Ct. 2183, 2189, 65 L.Ed.2d 115 (1980)] (Powell, J., concurring), a defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks."

The uncontradicted evidence discloses that Glover contacted Inspector Nevins, who in turn contacted the prosecution, only *after* Glover had obtained petitioner's statements. Until then the authorities were unaware of Glover's efforts in this case. Once aware of those efforts, they declined Glover's offer to interrogate petitioner while secretly recording the responses.

In his argument on this point to the New York Court of Appeals, petitioner insisted that Glover's past dealings with the Kings County District Attorney's Office created an agency relationship. Under the standard applicable to a claimed violation of the right to counsel under the Sixth Amendment, as enunciated in *Kuhlmann, supra,* the police must authorize their agent's acts *before* the fact. *See United States ex re. Milani v. Pate,* 425 F.d 6, 8 (7th Cir.), *cert. denied,* 400 U.S. 867, 91 S.Ct. 109, 27 L.Ed.2d 107 (1970); *Paroutian v. United States,* 370 F.2d 631, 632 (2d Cir.), *cert. denied,* 387 U.S. 943, 87 S.Ct. 2077, 18 L.Ed.2d 1331 (1967); *cf. United States v. Melanson,* 691 F.2d 579, 585 (1st Cir.1981) ("Where the government was not involved in obtaining statements from the accused in the absence of counsel, the statements have consistently been held admissible under the sixth amendment." (citations omitted)); *United States ex rel. Baldwin v. Yeager,* 428 F.2d 182, 185 n. 10 (3d Cir. 1970), *cert. denied,* 401 U.S. 919, 91 S.Ct. 905, 27 L.Ed.2d 822 (1971) ("[I]f the police deliberately isolated the defendant with prisoners who had in the past cooperated with the police, fully intending to interrogate those prisoners before trial regarding statements made to them by the defendant, ... such statements would be inadmissi-

ble."). Ratification by acceptance of the benefits of the informant's acts after the fact will not suffice. *See People v. Cardona,* 41 N.Y.2d 333, 335, 392 N.Y.S.2d 606, 360 N.E.2d 1306 (1977) (discussion therein). There is no merit to petitioner's claim.

### III.

Alternatively, petitioner asked the New York Court of Appeals to reopen the hearing on his motion to suppress Glover's testimony. After the second trial of these charges and before the Appellate Division reversed the resulting convictions, petitioner moved the State trial court to vacate his convictions on the basis of evidence which assertedly contradicted the prior evidence of Glover's relationship with the district attorney's office.

At the original suppression hearing, Assistant District Attorney Stuart Klein, assigned to the Rackets Bureau, testified that Glover had not been productive in relation to the shooting of Orsby Johnson by William Chasten, an incident Glover claimed to have witnessed. Specifically, Klein testified,

"A ... Orsby Johnson was found by two detectives in my office, and a presentation in the Grand Jury was scheduled, involving that particular shooting. As a result of that, Bobby Glover, with the aid of myself, at the instructions of my superior, at the time Barry Friedman, was le[t] back out into the street."

H. Tr. 134. He added that Glover's bail had been reduced and that Glover did not testify in the case. Thereafter, the relationship between Glover and the district attorney's office deteriorated, *viz.,*

"A I was constantly—he was constantly breaking appointments. None of his information ended up in any case. Say the William Chasten case, he was not productive. Mr. Friedman instructed me not to have any dealings with him anymore."

H. Tr. 136.

According to petitioner, Klein subsequently contradicted himself when he testified at a hearing on a motion to suppress Glover's testimony in a different case where Glover had also furnished a confession. Klein stated,

"A ... The information with regard to that arraignment was that he [Glover] had witnessed the shooting of a William—of an Orsby Johnson by a William Chasten. Taking this information, we assigned an officer from the District Attorney's office Squad to go and investigate the shooting which supposedly took place in the 77th Precinct. They [had] found that in fact the shooting had taken place. That in fact Orsby Johnson had been shot, and from there we got in touch with Orsby Johnson. He [Johnson] subsequently testified in the Grand Jury, and Mr. Chasten was indicted on a subsequent date."

App. 29. From the context, it appears more likely than not that the individual who testified before the grand jury was Orsby Johnson, a point further emphasized by the absence of any information indicating that Johnson had succumbed from the wound.

Here there was no indication that any material fact had been concealed. Whether Glover testified before the grand jury or at Chasten's trial, or not at all, is beside the point. The State never attempted to conceal that in exchange for information about the Chasten matter, Glover had received a tangible and motivating benefit in the form of a reduction in bail.

Petitioner's next assertion of concealment is difficult to follow. It concerns the failure to reveal that Glover received $100 on March 22, 1977, the date of the hearing on the motion to suppress his testimony. In his brief to the New York Court of Appeals, citing Glover's testimony and that of Inspector Nevins, petitioner argued that the prosecutor had concealed this payment. At the hearing, Nevins testified he did not know of any money paid to Glover other than $1200 on an unrelated matter. Petitioner has presented nothing to demonstrate the contrary.

Glover also acknowledged receipt of the $1200 and was asked on cross-examination, "Did you get paid any money at any time, any other time?", to which he replied, "No." H.Tr. 211. At petitioner's first trial, which followed almost directly after the hearing on the suppression motion, Glover testified that in exchange for his testimony he had been promised that his family would be relocated. When asked, "Was any other promise made?", he replied, "No." The totality of the financial arrangements between Glover and the prosecution came to light at the second trial; thus it would appear that Glover had not disclosed those arrangements.

Also at the hearing on the suppression motion, Assistant District Attorney Speiser, to whom Glover had been referred by Nevins, testified.

"At that time, I asked Mr. Glover if he was willing to testify to this in Court. He said that he would. I asked him if he wanted anything in consideration and he said that he was locked up on charges and wanted the charges, somehow, disposed of. So, he could get out in to the street. He also wanted—he was afraid that after he testified he would be killed, and he wanted to be relocated out of the City after he testified. I told him that at that time I was not prepared to make him any promises whatsoever, either with regard to his sentence or to receiving any assistance in leaving the City. I told him that I would get back to him at a later time."

H.Tr. 164. Again, such testimony is not inconsistent with making subsequent arrangements for payment of money, and certainly, if Speiser knew of those arrangements when he testified, he should have revealed them. Petitioner, however, fails to cite any place in the record where his counsel specifically asked Speiser to recite the terms of the agreement between Glover and the prosecution.

The Court does not fully understand the bearing of these claims of concealment on the trial here at issue. On direct examination, Glover testified that between March and October 1977 he had received a total of $2700 for his testimony against petitioner. Although that was withheld from a prior jury, it was presented to the jury that convicted petitioner in the last trial.

According to petitioner, however, the significance of these alleged concealments lies in the assessment of the evidence by the judge who denied petitioner's motion to suppress Glover's testimony. This same judge also denied petitioner's motion to vacate his convictions. The State contends that the trial judge elected not to change his assessment of the evidence on the suppression motion.

Before considering petitioner's contention, a third assertion of prosecutorial concealment, which does not relate to Glover's credibility, must be dealt with. Petitioner contends that the prosecution failed to disclose that Glover had demanded $25,000 in exchange for his testimony against petitioner. He bases this claim upon the testimony of Assistant District Attorney Martin Fogelson, deputy chief of the Homicide Bureau, who also testified in the hearing to suppress Glover's testimony in the other case. In response to that judge's questioning, Fogelson stated that whenever Glover came to the office, he requested a high price for information. Fogelson did not recall the exact amount(s). An amount in the range of $25,000 arose "somewhere either between the first Gilmore trial and the second Gilmore trial or immediately prior to the second Gilmore trial." App. 32. The court then asked if the judge presiding at the Gilmore trial had been aware of Gilmore's demand. In response, the prosecutor, Assistant District Attorney Callan, stated that he had read all the testimony in the Gilmore trial and that the $25,000 figure had come up during Inspector Nevins' testimony on the motion to suppress Glover's testimony.

That representation is accurate. Nevins testified that in October 1972 Glover had wanted $25,000 in exchange for information about two police officers who were selling narcotics at an apartment building in Brooklyn. That time period, however,

does not fall between petitioner's first and second trials. Apart from that incongruity, Fogelson never testified that Glover had demanded $25,000 for his testimony against petitioner. Rather, Fogelson related that Glover had demanded money at a time between petitioner's first and second trials. He did not identify the nature of the information Glover had sought to peddle. That point is minor in light of the fact that the jury knew that Glover's testimony had been bought and paid for.

■ Additionally, Glover's credibility or lack thereof and the prosecution's credibility or lack thereof concerning these alleged concealments do not alter the facts relevant to petitioner's claim that through Glover, the police had interrogated him in violation of his right to counsel. The evidence Glover had obtained on his own from petitioner and offered to the authorities remains uncontradicted except for petitioner's testimony that Glover had completely fabricated the inculpatory statements. Petitioner's testimony, however, furnishes no basis for suppressing Glover's testimony. Assuming *arguendo* that the State's evidence on the suppression motion were to be discredited, the record would be silent. Discrediting the State's witnesses would not permit the Court to infer the opposite of their testimony, *i.e.*, that either Speiser or Nevins or both had encouraged Glover to obtain statements from petitioner. Upon a silent record, petitioner would have failed in his burden of demonstrating that his alleged statements had been obtained in violation of his right to counsel.

### IV.

■ Petitioner next contends that on two occasions during the trial the State court deprived him of the right to present evidence in his own behalf. As previously noted, when petitioner learned that armed police were looking for him, he took a bus to South Carolina. At trial he sought to explain the reason for this seemingly sudden departure through the testimony of his sister, Dolores Drayton. On the evening of June 6, 1976 she was at her home in Brooklyn when police officers arrived carrying shotguns. The officers, some of whom testified at trial, intended to arrest petitioner.[3] In the course of the subsequent search of the premises, Nathaniel Drayton arrived and an officer pointed a shotgun at him because the police lacked petitioner's description. Upon being satisfied that Drayton was not the suspect, the officers left a business card with Dolores, who later telephoned the Arion Manor, a catering house or restaurant in Brooklyn where petitioner was then attending a christening. Dolores spoke with Lenore Sierra, petitioner's mother-in-law, relating to her what had happened and that the police were looking for petitioner. The jury heard only that Drayton was at home that evening and that she had made a telephone call. The state trial court refused the remainder of Drayton's testimony.

Petitioner argues that Drayton's testimony would have provided an explanation for his apparent flight from the jurisdiction. He claims that out of fear for his safety, he did not want to confront the police because they were armed. Although the state trial judge had ruled that petitioner could explain what he pleased when he testified, he later denied petitioner the right to introduce evidence that his flight was prompted by his fear of being shot by the police. That ruling was erroneous.[4]

"Q Now, did there come a time during the course of the evening when you

---

**3.** According to the testimony, the carrying of a shotgun by officers in search of a homicide suspect is standard procedure.

**4.** New York law specifically recognizes that "[e]vidence should be admitted which is probative of an explanation for an accused's flight other than consciousness of guilt of the crimes allegedly committed by him. When the prosecution has offered evidence of flight of an accused as tending to show guilt, the accused may explain his reasons for fleeing and is entitled to the benefit of any explanation of his flight consistent with his innocence. (citations omitted)". *People v. Gonzales,* 92 A.D.2d 873, 459 N.Y.S.2d 823, 825 (2d Dept.1983) (memorandum).

learned something as a result of the conversation with Dolores?

"A Yes.

"Q As a result of that conversation did you leave the Arion Manor?

"A Yes, I did."

Tr. 405. Petitioner then testified that after borrowing some money from his mother-in-law and telling her he was going to a precinct in South Carolina, he took a bus from the Port Authority terminal in Manhattan to Charleston, South Carolina, where he arrived at an uncle's home on June 8. At this point, the jury had not been apprised of what petitioner had learned from his sister.

On cross-examination petitioner testified,

"Q Well, you knew they were looking for you, didn't you?

"A Yes, the police had—

"Q You knew they were looking for you, didn't you?

"A My sister called— ...

"Q Isn't it a fact that you knew that the police were looking for you?

"A Yes. The police had called my sister.

"Q I didn't ask you that, did I? I asked you whether you knew whether the police were looking for you.

"A Yes"

Tr. 456.

Although petitioner's mother-in-law was not called as a witness, defense counsel sought to raise the subject on redirect as follows:

"Q Now, when you were at the Christening, did there come a time, yes or no, when you had a conversation with your mother-in-law Lenore? Yes or no.

"A Yes.

"Q As a result of that conversation, did you learn about certain actions of the New York City Police Department? Yes or no.

"A Yes."

Tr. 464. The trial judge sua sponte struck the last question and answer from the record and admonished the jury to disregard it. The net result is that the jury never really heard petitioner's explanation of an otherwise inculpatory circumstance upon which the prosecution later commented during summation.

Petitioner's other assertion of error concerns testimony intended to contradict a portion of Glover's testimony. As reproduced above, according to Glover, petitioner had related that a Charleston police sergeant had entered the house where petitioner was staying and had recognized petitioner as an individual wanted for murder in New York, whereupon petitioner unsuccessfully attempted to bribe the officer. Petitioner called Detective Sergeant George H. Gathers, a 32 year veteran of the Charleston County, South Carolina police department, and the individual to whom petitioner had surrendered in the parking lot of a Charleston shopping center. An argument ensued about Gathers' relevance to the case. Defense counsel stated that Gathers would relate the events of the surrender and,

"... I further will certainly intend to ask him, were you ever in a house on this date in which Mr. Gilmore was present? Were you ever offered [a] ten thousand dollar bribe?

"THE COURT: I won't let you ask that."

Tr. 379–80. The examination of Gathers occurred within the court imposed limitation, i.e., that he never met petitioner at petitioner's uncle's house. No mention was made regarding an attempted bribe.

In the brief to the New York Court of Appeals, the State asserted that this error was not preserved for review, a point obviously not accepted because the Court of Appeals determined the merits. Cf. Hawkins, supra, 758 F.2d at 872 n. 8. The State also argued that Gathers' testimony would have been cumulative because he testified that petitioner surrendered voluntarily after initiating the contact. The New York Court of Appeals found that reasoning unpersuasive but ruled that the trial judge's exclusion of the testimony of both Drayton and Gathers was harmless error in light of the other evidence. In determining that the trial court had erred

in excluding this testimony, the New York Court of Appeals relied on the venerable rule that,

"The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law."

*Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967).

Having found error of constitutional magnitude, the Court must consider the entire record to determine whether this error is harmless beyond a reasonable doubt. *Rose v. Clark*, —— U.S. ——, 106 S.Ct. 3101, 3109, 92 L.Ed.2d 460 (1986).

That requirement prompted the court to obtain the photographs of the scene and a documentary exhibit, the latter of which was not admitted at trial but marked and sealed to be examined by an appellate court. The documentary exhibit is a transcription of a question and answer session between Assistant District Attorney Speiser and Roger Lee, held March 25, 1977.

Although available, Lee was not called to testify on petitioner's behalf. His relevance relates to whether he heard petitioner make the incriminating statements Glover related to the jury. In another case, related to earlier trials of these charges, petitioner had produced a copy of an affidavit in which Lee stated that he never spoke to Glover or petitioner on June 16, 1976, and that petitioner was not in the holding pen on that date when Glover and Lee were there. *Gilmore v. Gold*, 632 F.Supp. 684, 689 (E.D.N.Y.1986).

Based on his contact with Lee, it appears that defense counsel did not want to call him without first seeing the transcript of the March 25, 1977 interview. The prosecutor represented to the trial court that the interview had revealed nothing exculpatory. The trial court agreed and on petitioner's application ordered the exhibit sealed and made part of the record for appeal. Tr. 477.

After this Court had requested the Lee interview, petitioner's counsel, in his reply affidavit, referred to the exhibit as follows:

"Further, petitioner's desire to impeach Glover, by calling as a witness one Roger Lee, was frustrated by the Trial Court. Glover admitted Lee was present at the time [Gilmore] allegedly made his confession. The defense had brought Lee to the trial and requested a copy of a statement the prosecutor had taken from him. The Trial Judge examined the statement but refused to give defense counsel access thereto. Had the statement contradicted Glover's testimony as to a confession from Gilmore, it clearly would have been 'Brady material'. In any event, failure to disclose its contents prevented defense counsel from calling Lee as a witness, again denying petitioner an opportunity to call witnesses in his own defense."

In response, the State contends that this issue was never raised in any State appellate court and therefore petitioner has created a "mixed petition", *i.e.*, one containing exhausted and unexhausted grounds, which must be dismissed for want of jurisdiction. The State has cited no authority for the proposition that the contents of petitioner's counsel's affidavit have somehow effected an amendment to the petition. *Compare Powell v. Spalding*, 679 F.2d 163, 166 (9th Cir.1982). Before and after the submission of the reply affidavit, the petition raised five (5) exhausted grounds. *See Sales v. Harris*, 675 F.2d 532, 540 n. 6 (2d Cir.), *cert. denied*, 459 U.S. 876, 103 S.Ct. 170, 74 L.Ed.2d 140 (1982).

Given the continued presence of jurisdiction, the Court must proceed with a harmless error analysis.

"In determining whether a real or assumed constitutional error or defect is harmless beyond a reasonable doubt, a

reviewing court must determine 'the probable impact' of that error or defect on the decision maker below. If, upon review of the entire record, the court determines there is no reasonable possibility that the constitutional error or defect might have contributed to the result, then it is harmless beyond a reasonable doubt. Where a review of the record leaves a court without a doubt that the same decision would have been reached in the trial court had the error or defect not existed, the error or defect is harmless beyond a reasonable doubt. A reasonable doubt is a reason in the record, and not vague, speculative, or imaginary doubt."

*Ritter v. Smith,* 568 F.Supp. 1499, 1519 (S.D.Ala.1983) (citations omitted). In undertaking that analysis, the Court must assess the gravity of the error in excluding Drayton's and Gathers' testimony from the jury relative to the totality of the proof offered against petitioner. *United States v. Brown,* 699 F.2d 585, 591 (2d Cir.1983); *Klein v. Harris,* 667 F.2d 274, 290 (2d Cir.1981).

A review of the Drayton and Gathers evidence discloses that it pertained to two relatively insignificant points. *See United States v. Chason,* 451 F.2d 301, 305 (2d Cir.1971), *cert. denied,* 405 U.S. 1016, 92 S.Ct. 1291, 31 L.Ed.2d 479 (1972). The absence of an explanation for the purpose and timing of petitioner's trip to Charleston is immaterial in light of the inculpatory inferences to be drawn from his conduct immediately following the shooting incident. The evidence permitted, the jury to infer that petitioner had acted in a manner consistent with a consciousness of guilt even before he learned that the police were in pursuit armed with shotguns. As soon as petitioner and Murdock had parted, petitioner was free to contact the police. He had a telephone in his home and could have promptly alerted the police to the crime which he maintains was committed by Murdock, a crime which had extinguished the life of his friend and benefactor and possibly that of Ms. Sneed. His failure to do so strongly indicated a consciousness of guilt

as great as the subsequent flight, which could hardly be overlooked by the jury.

Furthermore, whatever nullifying effect Gathers' testimony might have had on Glover's testimony, it would not have contradicted Murdock or Sneed. *Compare United States v. Robinson,* 544 F.2d 110, 115–16 (2d Cir.1976), *cert. denied,* 434 U.S. 1050, 98 S.Ct. 901, 54 L.Ed.2d 803 (1978). Similarly, Drayton would not have contradicted Murdock, Sneed, or Glover. *Id.* Likewise, neither Gathers nor Drayton would have negated the circumstantial evidence of guilt, drawn in part from petitioner's own testimony.

Concerning informant Glover's testimony, petitioner related that on June 16, 1976 he was in a holding pen in the Brooklyn Criminal Court to meet with his attorney about testifying before the grand jury. On that date Roger Lee was present, Glover was not present, and petitioner was never on the fourth floor where Glover claimed to have talked with him. The transcript of the March 25, 1977 interview between Speiser and Lee was made part of the record. Lee had stated that he knew petitioner for 11–12 years and that he had never discussed the case with him.

"A. Truthfully speaking, as far as Mr. Glover is concerned and Mr. Gilmore, I don't remember being in the bullpen with them at all."

Lee added that he had spoken about the case with Glover in the Brooklyn House of Detention.

"A. ... We spoke of the case, the Kennie Gilmore case, after I told him I knew Kennie, we started rapping about the case and the reports in the newspaper and in Jet Magazine. He was asking questions about Kennie. I told him, 'Look, as far as Kennie's case is concerned, I don't know nothing about Kennie's case.' We were rapping about the case. He was telling me a lot of shit about it. How he knew Mr. Gross and how he knew a witness.... The Conversation came up again about Mr. Gilmore's case, you know. He said he read

something in an article, he brought in Jet Magazine to me. He told me that here was the article again. We spoke about the case, you know. I told him I knew Kennie very well. I told him, 'I doubt very sincerely Kennie was down on that.' I just ended the conversation I told him it had no bearing on me at all."

Lee only remembered that this conversation had occurred some time in 1976.

The prosecutor had also refused to give defense counsel access to this statement to avoid the possibility that Lee would tailor his testimony to the prior statement. At trial, when defense counsel realized that he could not review the statement prior to calling Lee, he consulted with Lee and decided not to call him.

Undeniably, Lee's statement casts a shadow over Glover's testimony; however, petitioner never offered alternative evidence tending to show that Glover knew Gross or had crafted his testimony from media accounts of the case available to anyone. Because the jury did not have Lee's testimony or his prior statement, they do not affect the harmless error analysis. Additionally, any issue about whether the jurors should have heard Lee's testimony is not before the Court.

The circumstantial evidence at the scene was largely inconclusive in pinpointing Gross' murderer with one exception. The autopsy of Gross disclosed 3 bullet wounds in an "L" shaped pattern behind his right ear.

"The two lower wounds lined up horizontally at a level with the opening of the right ear, one was located one and a half inches behind this hole, the other two and a half inches behind the hole, and above this back one, three-quarters of an inch above it was the third bullet wound of entrance."

Tr. 64 (direct examination of Dr. O'Connor). A reddish burring or brand surrounded the front lower wound, indicating that the gun muzzle had been held directly against the victim's head. The path of this wound, which ran from right to left, led to a small deformed lead bullet, marked "G", in Gross' brain stem. The path of the second wound, which began 2½ inches behind the opening of the right ear, ran from "right to left and backwards" and led to a .32 caliber bullet, marked "G/W", in the neck muscles. An abrasion cuff surrounded this wound. The path of the third wound, which also had an abrasion cuff, led outside the body at the front side of the right cheek. A small sliver was recovered from the right cheek muscles.

Only one of the wounds exhibited tattooing, small contusions or bruises left by flakes of gunpowder on the skin surface of the entrance of a bullet wound.

"A ... as the muzzle of the gun is further away from the object that is hit, in this case the skin surface, it leaves less and less residue, and between roughly six to seven inches up to twelve to eighteen inches one would fi[n]d tattooing about the skin surface."

Tr. 71. The medical examiner further explained that after 18 inches distance there would be no tattooing. The tattoo on only one wound meant therefore that two of the wounds had been inflicted by a gun held more than 18 inches from the victim. It was not possible to determine from the wounds whether the weapon was fired from the left or right side of the car nor whether the assailant was left or right handed.

The police recovered one deformed .32 caliber bullet, marked "AR 1", from the driver's section of the car and another deformed bullet, marked "M", from the left front of the vehicle. As Detective Roussine, the field investigator explained,

"A There was a bullet impact mark meaning a projectile had struck the part of the windshield in front of the driver six inches down from the top of the windshield and twelve inches from the left side, placing it approximately in front of the driver. There was a cratering effect in the windshield but the projectile had not penetrated to the outside."

Tr. 54. Detective Simmons, the ballistics expert who examined the bullets marked "AR 1", "M", and "G/W", could only con-

clude that they were fired from the same type of gun. They exhibited similar characteristics but were too deformed to allow a positive identification.[5]

Referring to the angle of the bullet that hit the windshield, Detective Roussine testified:

"A The only angle, the position of the crater and the circular area of the crater indicates to me that the bullet was fired from inside the car in rather a direct line with the windshield.

"Q When you say direct line—

"A Perpendicular to the windshield." Tr. 57–58.

The photographs of the Citroen taken at the scene, People's Exhibits 1–5, disclose that a line perpendicular to the crater in the windshield leads directly to the left side of the backseat. It would not be unreasonable for a jury to infer from that evidence that the bullet, which passed through Gross, hit the windshield and fell to the floor of the car, had emerged from a gun fired from where petitioner admits he was seated, behind Gross on the left side of the backseat.[6] Apart from the inculpatory nature of that evidence, the ballistics evidence, coupled with the testimony of a disinterested witness, tends to discredit both petitioner and Murdock. Three bullet wounds in Gross and the recovery of 3–4 bullets, and possibly a fifth bullet imbedded in Sneed, compel the conclusion that more than two shots were fired.[7]

On June 6, 1976 Ivan Natchev owned the Paris car wash located on the Flatbush Avenue Extension only a short distance from where the Citroen came to a halt. At that time he also owned a gas station, located on Flatbush Avenue across the street from the car wash. He noticed the Citroen as it approached Flatbush and Myrtle Avenues because he had lived in France. The car proceeded toward Gold Street and then,

"A ... I heard a puck, puck, puck, and the car stop slowly by Colmer (phonetic) Company, some building there on the side, and stay for two, three minutes maybe and the car begin to roll back, and two people came out. First one, guy came out, sticking out, try to get out from the car. He get out from the car. Another fellow come out from the car on the right-hand side and the car continue rolling back and stop on the Flatbush Avenue Extension. That's all. [A]fter a while some lady came out from the car with the blood, I imagine. I don't go down there to look at it. She was crying and come back in the back of the car and went to sit in the front seat in the car."

Tr. 78. In front of the jury, Natchev traced the Citroen's path on People's Exh. 5, an aerial photograph of the area at Flatbush Avenue and Gold Street.

Natchev's testimony may contradict Murdock's version and confirm petitioner's version of how they exited the car after the shooting. The exact opposite is also true based upon Natchev's answer to the question, "Did you see where these two men you say got out of the right side of the car went?" Tr. 80. Natchev did not correct the questioner despite his not having said that both persons had exited from the right side of the car. According to his testimony, one individual emerged from the right hand side; the other merely emerged. Nevertheless, Natchev confirms that more than 2 shots were fired and therefore, that Murdock and petitioner were mistaken in having heard only 2 shots.

---

**5.** The record appears to show recovery of two bullets from Gross' body and two from the car; however, Simmons only examined three exhibits. During Simmons' testimony, the exhibit marked "G/W" was described as 3 pieces of metal, the largest being a .32 caliber bullet.

**6.** No ballistics evidence was offered concerning Sneed's wounds. The physician who treated her observed wounds on both side of her face, and the x-ray reports showed 3 larger metal frag-

ments and other smaller pieces of metal in her jaw and behind her eye. From the x-rays and his examination, the physician surmised that,

"A The bullet passed through the skin and then broke the jaw and then possibly fragmented at that time."

Tr. 279.

**7.** On cross-examination Murdock testified that he had heard two shots.

The Court need not reconcile the various inconsistencies and contradictions in the evidence. The excluded evidence would have had little impact on the other evidence of petitioner's guilt. As a result, the Court concludes that the erroneous exclusion of Gathers' and Drayton's testimony was harmless beyond a reasonable doubt.

### V.

Petitioner's first contention under this issue concerns proof that Glover lied about the nature of his deal with the prosecution. On cross-examination Glover denied that he had any of his cases dismissed in exchange for his testimony against petitioner. Defense counsel then sought to explore the individual cases and their dismissals apparently to show a coincidence between the dismissals and Glover's testifying against petitioner. That relationship is not clear from the record, and the prosecutor represented that, to the best of his knowledge, Glover had never had a case dismissed in exchange for information. In response, the trial court ruled that counsel could ask the same question that had already yielded Glover's denial and observed that the prosecution's concealment of consideration to Glover would be grounds for reversal of a conviction.

At both the trial and the hearing on the suppression motion of an earlier unrelated case, Glover testified that he believed that three 1974 charges arising from one case had been "adjourned contemplating dismissal" on the basis of information he had provided about the shooting of Orsby Johnson. App. 63. At best, therefore, the alleged perjury materializes only by inference; however, the issue is not properly presented for review. Defense counsel possessed Glover's earlier testimony at this trial. Portions of that same transcript had been used to support the aforementioned motion to vacate the convictions; yet counsel never brought this alleged inconsistency to the trial court's attention.

The record falls squarely within *People v. Washington*, 32 N.Y.2d 401, 345 N.Y.S.2d 520, 298 N.E.2d 665 (1973), where the Court stated,

"On the present *coram nobis* application, however, Washington repeatedly asserts that just prior to his trial, he had been informed by Anderson of the promises made to Anderson by the prosecution. When at his trial Washington took the stand to establish an alibi, the Trial Judge, on his own, examined him closely as to whether he knew any reason why Anderson would have given the testimony against him which Anderson had. Washington was then evasive and failed totally to disclose to the court or to the jury the knowledge he had of the promises which had been made to Anderson.

"Further, at the hearing on this application, Washington's counsel, who had also been his trial counsel, informed the court that the report of Anderson's pretrial disclosure of the promises made to him was not a recent contrivance. With commendable candor counsel told the court that Washington had told him at the time of the trial of the information furnished by Anderson.

"We deplore the failure of the prosecutor immediately to correct the entirely false impression left by Anderson's testimony. Where, however, as here, both the defendant and his counsel, with knowledge of the facts, stood silently by and did nothing themselves to remedy the situation, we would make a very limited exception to the [rule announced in *People v. Savvides*, 1 N.Y.2d 554, 154 N.Y.S.2d 885, 136 N.E.2d 853 (1956)]. To do otherwise, in our view, would be merely to punish the prosecution, and thus to penalize the People, where there cannot be said to be legitimate interests of the defendant to be protected."

*Id.* at 403, 345 N.Y.S.2d 520, 298 N.E.2d 665; *see United States v. Harris*, 498 F.2d 1164, 1170 (3d Cir.), *cert. denied sub nom. Young v. United States*, 419 U.S. 1069, 95 S.Ct. 655, 42 L.Ed.2d 665 (1974).

As a result of defense counsel's silence, Glover's earlier testimony was never made part of the record in the trial court, an

observation made by the State in its brief to the New York Court of Appeals. In New York, matters contained in a brief but not made part of the record in the trial court are not considered on appeal. *People v. Garner*, 99 A.D.2d 596, 471 N.Y.S.2d 420 (3d Dept.1984) (memorandum); *People v. Roberts*, 89 A.D.2d 912, 453 N.Y.S.2d 727, 729 (2d Dept.1982) (memorandum); *People v. Walrath*, 52 A.D.2d 961, 382 N.Y.S.2d 844 (3d Dept.1976) (memorandum); *People v. Barrett*, 33 A.D.2d 633, 305 N.Y.S.2d 111, 114 (4th Dept.1969) (memorandum). Consequently, the record discloses an adequate State ground, upon which the New York Court of Appeals relied when it stated,

"Defendant's remaining arguments, to the extent they have been preserved for our review, are without merit."

498 N.Y.S.2d at 754.

■ On the basis of its earlier analysis concerning petitioner's failure to object to the revelation of his post arrest silence, the Court concludes that this issue has been deemed waived by the New York Court of Appeals. Similarly, as before, petitioner has not asserted any cause or prejudice to justify his procedural default. *See e.g., Garcia v. Warden*, 613 F.Supp. 302, 307 (S.D.N.Y.1985).

Petitioner's second complaint about a frustrated attempt to impeach Glover is without merit for the same reason. On cross-examination, Glover testified that he had never denied having been paid by the prosecution for testimony and had never tried to keep it a secret. Thereafter, he clarified an answer from an earlier proceeding to the effect that he had testified that he had been paid for testimony only one time in 1972. He next did not remember having answered, "Yes" to "Were you asked about any consideration you were getting in return for your testimony?", Tr. 341, in October 1977. He was then asked,

"Q Were you asked this question and did you give this answer? Page 500. 'Question: Did you tell anybody about any money that you had received? 'Answer: No, not that I recall.'"

*Id.* In response to the prosecutor's objection to this question, the trial court instructed the jury as follows,

"An attorney may ask a witness whether he previously made a statement where that statement is inconsistent with his present testimony. He may not ask it if it is not an inconsistent statement. The question and answer that [defense counsel] just read is not inconsistent with the answer he gave."

*Id.*

In his brief to the New York Court of Appeals at 24, petitioner asserted that Glover had lied in originally denying he had received money, later admitted he had never mentioned receiving money and now claimed he had never tried to keep it a secret. On the contrary, petitioner never established that Glover had earlier denied receiving money for his testimony against petitioner, unless that testimony were understood to mean that Glover had been paid only once as opposed to only once in 1972. Undeniably, the difference between what Glover had actually stated and what he had meant in the context of the examination was resolved in Glover's favor through the trial court's instruction to the jury. After that instruction, defense counsel proceeded to another matter. He offered no objection to the instruction and never asserted that any ambiguity on this point should be resolved by the jury, *i.e.,* that the jury should determine exactly what Glover had meant in his earlier testimony and then whether his current testimony was inconsistent.

The Court concludes that the New York Court of Appeals deemed the matter waived because of defense counsel's failure to interpose an objection or otherwise protest the trial court's ruling. *See People v. Dickson*, 112 A.D.2d 312, 491 N.Y.S.2d 759, 761 (2d Dept.1985) (memorandum); *cf. People v. Charleston*, 56 N.Y.2d 886, 453 N.Y.S.2d 399, 438 N.E.2d 1114 (1982). Again, petitioner has asserted no cause or prejudice to justify this procedural default.

For the above reasons, the petition for writ of habeas corpus is denied.

SO ORDERED.